(135 So. 665)

## ARTIGUES v. ARTIGUES.

### No. 31114.

May 25, 1931.

Rehearing Denied June 22, 1931.

Paul W. Maloney, of New Orleans, for appellant.

Lemle, Moreno & Lemle, of New Orleans, for appellee.

ODOM, J.

Plaintiff and defendant were married in the city of New Orleans on April 3, 1929, and lived together as husband and wife until September 15, 1930, when Mrs. Artigues left her husband and went to the home of her father and mother. On October 19 following, she brought this suit for separation from bed and board and for alimony, alleging, as her grounds therefor, ill treatment and cruelty toward her on the part of her husband, the cruel treatment consisting of his refusing to provide a separate home for her, refusing to permit her to visit her parents, and that "he assaulted and struck her violently, particularly in October 1929 and in July 1930, he beat her with a strap and has continuously threatened her with such punishment."

Answering these charges, defendant admitted that he had not provided a separate home for his wife, alleging as his reason that he was not financially able to do so, which fact he alleged was well known to plaintiff before they were married. He admitted that he had requested his wife not to visit her parents, but alleged that he had not forbidden her to do so. He denied, that he had ever assaulted or beaten her.

Plaintiff's demands were rejected by the district judge, and she appealed.

The matrimonial venture upon which this young couple engaged in 1929 seems to have been a failure from the start. They were both young, scarcely more than children. The husband was not established in life, had no home of his own, and no means of support. He had no trade or profession from which he could earn a living for himself, much less a family. His father was engaged in the wholesale rice business in the city of New Orleans, and some arrangement was entered into by which the son visited retailers in the city and solicited orders for rice; his commission being 5 cents on each pocket of rice sold. He sold on an average of fifty pockets a week, making his gross earnings $2.50, or something over $10 a month. He used an automobile in making the rounds of the city; the expense of keeping it up being $1 a day.

But his generous and indulgent parents were living, had a comfortable home, and took care of him. When the couple were married, the groom had nowhere to take his bride except the home of his parents, and there he took her, and there they remained as long as they lived together. We gather from the testimony that the wife was cheerfully received by the husband's parents, and that she was well treated.

Mrs. Artigues knew before she married that Mr. Artigues was not earning a living for himself, and she knew that after they were married they would have to live with his parents. She knew also after they were married that her husband was earning practically nothing and had no means at all except a gratuitous allowance given him by his father, and yet she attempts to have the court hold that her husband's failure to provide a separate home for her and his carrying her to live with his parents was cruelty, and this in spite of the fact that she admitted that her husband's parents gave to them the best they had.

█ It is cruel treatment under some circumstances for a husband to refuse to provide a separate home for his wife and force her to live with his relatives. This court so held in Verret v. Koelmel, 162 La. 277, 110 So. 421, Geisinger v. Conners, 130 La. 922, 58 So. 815, and Delsa v. Raymond, 126 La. 126, 52 So. 240.

█ But these were cases where the husband was able to furnish a separate home for his

wife and where the members of the husband's family with whom he forced her to live were hostile and antagonistic to her, so much so that she was never at peace and could not be happy. No case like that is presented here. The husband did the best he could for his wife, and his parents were kind and generous to her. It is true that plaintiff testified that she did not get along well with her husband's mother, but, when asked especially as to what disagreements they had, she stated that her mother-in-law made it her business to tell plaintiff's husband about her leaving home during his absence. We find no merit in this point.

■ Defendant admits that he requested his wife to remain away from the home of her parents, where two or three of her sisters were residing. He stated his reasons for making the request, which we think are good. But, whatever his attitude may have been in this respect, the facts are that he was not successful in keeping her at home. She did as she pleased and went anyway.

■■ Now as to the other charges of cruelty, she says that within three months after they left the marriage altar her husband was beating her with his hand until her body was "black and blue," and finally whipped her with his leather belt in July, 1930.

These charges have some foundation in fact, but are grossly overdrawn and exaggerated. Defendant admits that he did slap his wife with his hand, and we think he probably did so on more occasions than one. But the record discloses that these parties were childish, impetuous, and high-tempered; that they were entirely too young to be discreet in their conduct toward each other; that they would disagree, then argue, lose their tempers, and quarrel until the boiling point was reached, and, according to the husband, they would then run together. He says she

would try to scratch his face and pull his hair and to keep her from doing that he would take hold of her hands, turn her around, and it seems that on one or two occasions at least when he turned her around he spanked her. Now whether the spanking improved her disposition for the time or whether she thought she deserved what she got is not quite clear, but it is evident from her subsequent attitude and conduct toward her husband that she did not take the affairs very seriously, for she was asked, "What did you say to your husband after this alleged slapping took place?" and she answered, "I did not say anything, but went to him and forgave him for what he did." She was then asked, "Is it not a fact that while this excitement was going on you tried to pull his hair and scratch him?" Her answer was, "It was so many times he did that, I guess I did do that to stop him from hitting me."

The record establishes that, while the defendant's husband frequently lost his temper and was guilty of some slight physical violence toward his wife, his conduct was by no means unprovoked. His wife was also high-strung and probably of a belligerent nature. She seems to have been about as ready as he for an occasional run-in, although she says in some parts of her testimony that his abusive conduct toward her was without reason or even excuse. But we are not so impressed from the testimony as a whole that the husband ever deliberately abused or mistreated his wife. On the contrary, the testimony indicates that their clashes were due to childish outbursts of temper on the part of each, which clashes do not seem to have been taken very seriously by either and were soon forgotten.

She says she never said anything to him about them "but went to him and forgave him for what he did. * * * I always kissed him whether we had quarrelled or not. * * * I always kissed him when he left for work—

sure I did." She says she kissed him good-bye the morning she took her final departure, but did not tell him she was going.

From the record as a whole we are impressed that these occasional broils and clashes were due about as much to her fault as to her husband's. We think they were both at fault. Such physical violence as the husband may have inflicted upon his wife, which we think was slight, resulted from physical encounters which in the beginning were not one-sided affairs. She admits that she scratched him and pulled his hair, or at least tried, but says she did so to keep him from spanking her. He admits that he spanked her, but says he did so because she tried to scratch his face and pull his hair. These encounters took place in the private apartment of the couple, and were not witnessed by outsiders, so that we must take the testimony of the litigants themselves both as to what happened and as to who was at fault. Our conclusion is that they were both at fault and that their wrongs were mutual. Under such circumstances, plaintiff is not entitled to relief. McKoin v. McKoin, 168 La. 32, 121 So. 182; Weiser v. Weiser, 168 La. 847, 123 So. 595; Snell v. Aucoin et al., 158 La. 767, 104 So. 709.

Judgment affirmed.