HIGGINS, Justice.
 

 The husband appealed from-a-judgment granting his wife a separation- from bed and board on the grounds of cruel treatment and awarding her the permanent custody of her two minor daughters and alimony; and dismissing his- reconventional demand also based on alleged cruelty.
 

 After a careful examination of the record, our views are in accord with those expressed by. the learned trial judge in a
 
 *161
 
 written opinion and we, therefore, quote it in full with approval:
 

 “Mrs. Helen Simon sues her husband, Vernice Cormier, for a separation a mensa et thoro, alleging as grounds therefor various acts of cruelty and abuse on the part of her husband towards her. To her main demand she joins incidental ones for the temporary, and, finally, permanent custody of the two children born of the marriage and for alimony pendente lite at the rate of $40.00 monthly, commencing from the date of judicial demand.
 

 “The defendant entered a general denial of the various acts of cruelty and abuse attributed to him and, in reconvention, set out the shameful and violent conduct on the part of his wife towards him, and prays judgment in his favor, rejecting the plaintiff’s demands and granting him a separation and the custody of the two children.
 

 “The reconventional demand of the husband is based, according to the allegations, on the wife’s threats to take her husband’s life, her intention and preparation to carry out these threats and her actual attempt to take his life. The assault upon the husband is set out in Article XV of the answer, and is to this effect, that the plaintiff in the early part of May, 1937, while both were in the kitchen, abused him and threatened his life, and thereupon took a butcher knife into her hand and made an assault therewith on him, with the intention to take his life, and that he was forced to 'pick up a chair to ward off the blow of the knife.
 

 “(1) Defendant as a witness testified to this attempt made on his life by his wife and relates the incident as he alleged it. He gives no account of any conversation preceding the alleged assault, or any quarrel between them or any presently existing provocation, or any antecedent conduct on the part of either one which might have induced or provoked this sudden and unexplained attack. No reason or motive for such an unusual act is assigned by the husband, except his conjecture that she did not love him. Standing alone, the husband’s testimony cannot and does not impress the court. But he offers, in corroboration, the testimony of Harry Broussard, his first cousin, who is said to have been present when the alleged assault took place. Broussard testified substantially to the same effect as did the husband regarding the assault. He seems possessed of a strange presence convenient to the defendant, being present at two crucial and fateful events relied on by the defendant for his separation, viz: the present one and the one at which the wife is alleged to have admitted that she had concealed a safety razor blade under the mattress, with the intention of using it on her husband and thus carrying out her repeated threats to kill him. But Broussard’s presence on these two occasions is not well established.
 

 “The assault is alleged to have been made in May, 1937, and the plaintiff and defendant parted ways in November, 1937. After the separation, defendant is said to have confided to his good friend, Mrs. John Trahan, an aunt by marriage of the plaintiff, to whom she was also friendly, that his wife had made an assault with a knife on him. Mrs. Trahan is said to have been much concerned over this unusual occur
 
 *163
 
 rence and apparently believed the defendant, and stated that she would not live under the same roof with any one who had attempted to kill her, and inquired whether they were alone at the time, and the defendant replied that Harry Broussard was at the defendant’s place at the time, but not in the house or kitchen, he, Broussard having gone to and being in the yard at the time. Mrs. Trahan was and is friendly to both sides in this controversy, as is Mr. Trahan; neither has any reason to testify falsely or distort the truth; neither has any interest in the outcome of this suit, and the Court was favorably impressed by their apparent desire to tell only the truth.
 

 “The testimony of the defendant, barren of any reasonable motive for the sudden and unprovoked attack by his wife on him, supported only by the testimony of one who was only probably at the scene, and only probably at another, as will hereafter be shown herein, is not such as will establish the complaint and certainly not one to support a solemn decree.
 

 “(2) One of 'the defendant’s complaints in reconvention is that his wife intended to do away with him and made careful preparations to carry out her design by placing a safety razor blade under the mattress of their bed, the same to be used for the purpose aforesaid.
 

 “There is much controversy as to who was or were present at the time the mattress was removed under which lay that small implement of death, said to have been planted by the plaintiff and said to have been admitted by her to have been planted in order to bring about her husband’s death. In this instance we know that Harry Broussard was not present because both sides to the controversy testify that he was not, although the defendant and Broussard testify that the latter was present. One line of testimony has the plaintiff, the defendant and Tanute Broussard present on that occasion. The latter is an uncle of the defendant and father of Harry Broussard. Another line has the plaintiff, the defendant and one or two of the former’s sisters there. But in neither line do we find Harry Broussard. The plaintiff and her sister, who was present at the dismantling of the bed, testified that no razor blade fell to the floor and, therefore, no occasion arose which might have elicited the guilty admission attributed to the plaintiff. And Tanute Broussard testified that he saw the fateful descent of the little blade from its resting place to the floor and heard the plaintiff admit that she intended to use it to her husband’s entire undoing, and that only he, the plaintiff and the defendant were there and that his son, Harry Broussard, was at that time on a horse driving a cow into the yard.
 

 “Harry Broussard’s father having denied that Harry was present at the time, we find it impossible to hold that he was. But there is great doubt in our mind even as to whether the incident complained of even took place. It is passing strange on an occasion when partisans and foes alike gather for the distribution of the common .goods of a husband and wife, who have parted, and every one present is tense and eager to hear and see the last dialogue and the closing scenes of a drama, that no one who claims to have witnessed the incident mentioned it to the others gathered in the kitch
 
 *165
 
 en and the yard, thereby allowing such spicy news to go unheralded to an audience undoubtedly ready and willing to hear it.
 

 “(3) In addition to the foregoing the defendant testified to threats made by his wife on many occasions. This testimony is not corroborated in any way, and like that on the other matters is not sufficient to grant the defendant a separation.
 

 “The plaintiff avers that she was married to the defendant on November 11, 1931 and that of her union with him were born two children; that immediately after the marriage the matrimonial domicile was established near the home of defendant’s father and mother, situated on the property of the latter; that during the first four or five years, while the defendant’s father was living, their married life ran smoothly, but after the death in February, 1937, of the defendant’s father, the defendant’s and his mother’s attitude became hostile, abusive and unbearable. She then sets out many acts of cruel treatment, such as his striking her and telling her to leave; his neglecting a sick child, although he was aware of and had been informed of her condition; neglecting to return to get her after taking her to her father’s home; refusing to eat and sleep at their home, and depriving her of the custody and companionship of one of her children and several other similar acts of neglect and abuse.
 

 “The view we have taken, based upon a careful consideration of the whole record, makes it unnecessary to consider the various acts of cruelty and abuse as alleged. For, the real basis of the plaintiff’s complaint and the cruelty and abuse to which she was subj ected were due to and originated in the defendant’s persisting in allowing the family home to be located and maintained in proximity to the home of his mother, when he well knew that his mother’s attitude towards the plaintiff was hostile and unfriendly and one likely to bring about a disruption of their own home and family; in his disregarding the superior duty he owed her to establish his home, if he could (and the record shows that he could) at a place where she would be mistress, as she was entitled of right to be, and to rear her children uninfluenced by any one but her husband; in his allowing his mother to have control over one of his children, to such an extent that the child seldom returned to her mother and. when the child did return, she showed little or no affection for her mother and did not wish to remain, but insisted upon returning to her grandmother’s home.
 

 “It is cruel treatment, under the circumstances existing in this case, to refuse to provide a separate home for one’s wife sufficiently remote from his mother’s home. Most of the cases refer to the husband’s duty to provide a home separate from that of his own family, where his family is unpleasant, unkind or hostile to the wife, but the same reasoning also leads to the unavoidable conclusion that it also is his duty, when he can, to establish his home sufficiently remote from the home of his family so as to remove whatever hostile or unkind influences that this proximity might cause. Delsa v. Raymond, 126 La. 126, 52 So. 240; Geisinger v. Conners, 130 La. 922, 58 So. 815; Verret v. Koelmel, 162
 
 *167
 
 La. 277, 110 So. 421. In this connection see 38 A.L.R. 338 et seq., 47 A.L.R. 687. The cases of Copping v. Termini, 13S La. 224, 65 So. 132 [L.R.A.1915A, 222]; and Artigues v. Artigues, 172 La. 884, 135 So. 665 [76 A.L.R. 981] may also be consulted.
 

 “What was said in the case of Powell v. Powell, 29 Vt. 148, 150, may also be said here, in connection with the defendant still cleaving to his mother in defiance of his duty to his wife—
 

 “ ‘This would be very far from compliance with the Scriptural exposition of the duty oh husbands : “For this cause shall a man leave father and mother and cleave to his wife, and they twain shall be one flesh.” ’
 

 “In addition to the plaintiff’s being exposed to the hostility or unfriendliness of her husband’s mother, she was also subjected to great and lasting grief in being deprived, with the assistance or at least with the approval of her husband, of the presence, cheer and affection of her own child, and of the right to rear it only as a mother can. The effect upon her happiness and her well being can not well be estimated.
 

 “Defendant as a defense contends that the plaintiff has condoned whatever cruel treatment and abuse she may have received, in that she remained with her husband long thereafter. In support thereof the case of Landry v. Regira, 188 La. 950, 178 So. 502, is cited. The principle announced and correctly applied in the cited case is not new; it has its basis on an article of the Civil Code.
 

 “But in this case the wife testified that she hoped against hope that matters would be adjusted and that they would again live together happily. To have left because of the husband’s treatment would have meant leaving her child behind, as it was at the home of her mother-in-law. In such a case the wife’s refusal to leave may more properly be referred to as forbearance than as pardon or condonation. Terrell v. Boarman, 34 La.Ann. 301; Mack v. Handy, 39 La.Ann. 491, 2 So. 181; Balfe v. Balfe, 165 La. 283, 115 So. 489, 490.
 

 “Custody of Children.
 
 The plaintiff is entitled to the permanent custody of her two children, Winona Ann and Annie Lou Cormier. The welfare of a child requires a custody and control under an undivided authority. This undivided authority, so necessary to the welfare of a child, has been shattered by the marital difficulties of the parents. The plaintiff, to whom the temporary custody has been granted, has not been arbitrary, the evidence shows, in the exercise of her authority having allowed the defendant to see his children whenever he desired and having invited him to do so! The only limitation the Court will place, under the circumstances now existing is allowing the defendant to call and see his children at the home of the plaintiff’s father, or any other home where she may reside, once a week, on a day and hour agreeable to the plaintiff and/or her father, and allowing the father to take his child to his home or his mother’s home once a month, on the last Saturday thereof, between the hours of 9 o’clock a. m. and 5 o’clock p. m., provided he call
 
 *169
 
 for them in person and return them promptly to their mother in person.
 

 “Alimony. The plaintiff claims $40.00 a month alimony. The evidence adduced on this demand is not very satisfactory. The defendant owns a small tract of land, which he inherited from his father; works his mother’s land, which is of considerable acreage, and the land of several other persons. He appears to have been a successful farmer, had ample means to take care of his wife and children well and properly, and was or is regarded as a hard-working, thrifty and provident man. But, as is usual in like cases, he testified he is no longer independent; that he works for his mother for food, lodging and ‘pin’ money. Be that as it may, the court is of the opinion that he can contribute $20.00 a month towards the support claimed, beginning December 20th, 1937, and monthly thereafter at the same rate, payable on the 20th day of each month. The amount accrued, namely, eleven months or $220.00, will be made payable on or before December 1st, 1938.
 

 “Judgment will be rendered in accordance with the foregoing reasons, with costs assessed against the defendant.
 

 “Proper decree should be presented.”
 

 While the sum of $20 per month appears to be entirely inadequate for the support of the wife and the two children, there has been no complaint made on this score and it will not be disturbed.
 

 For the reasons assigned, it is ordered, adjudged and decreed that the judgment appealed from is affirmed at appellant’s cost.