[Civ. No. 2730.  Fourth Dist.  Dec. 16, 1941.]

HAROLD  H.  NASON, Appellant, v. JEAN  M.  NASON, Respondent.

A. C. Finney and C. B. Smith for Appellant.

Harry W. Horton for Respondent.

BARNARD, P. J.—This is a contested action for divorce on the ground of extreme cruelty.  At the conclusion of the plaintiff's case a motion for a nonsuit was granted and a

judgment entered against the plaintiff, from which he has appealed.

The appellant, who is a druggist, and the respondent, who was a graduate nurse, were married on June 18, 1938. Shortly before their marriage each submitted to a premarital examination, which included a test for venereal diseases. Shortly prior to that the appellant, on the advice of his physician, had taken treatments for a venereal disease which he claims were merely precautionary.

Some time in January, 1939, the appellant learned that his wife was pregnant. Shortly thereafter, he left her and removed to a hotel. The respondent, who was called as the appellant's own witness and not for cross-examination under section 2055 of the Code of Civil Procedure, testified that shortly before such leaving the appellant asked her to have an abortion performed and that she replied that it was too late. While the appellant denied that he had thus requested an abortion, in a letter to the respondent's father written on April 25, 1939, after stating the fact that he had "always drunk considerably but while going with Jean toned it down" and referring to the fact that they had quarreled over his drinking, referred to the unborn child and said: "This also has been a very serious difference as I have not wanted children as yet. Jean deliberately deceived me in this, not letting me know until three months when nothing could be done."

After staying away a few days the appellant returned to live with the respondent. Some time in April, 1939, he learned that the respondent had taken a few doses of salvarsan, which is used in the treatment of syphilis. After receiving this information he wrote the letter to the respondent's father above referred to, saying he wanted a divorce but that the respondent did not want one and giving as the only reasons for his desire for a divorce that the respondent had tried for six months to "transform me into the ideal husband," that she had objected to his drinking and that she had deceived him with respect to the unborn child until it was too late to do anything about it. He testified that early in May he told the respondent that he had lost all affection for her, that he could not go on living with her but that he would remain with her until after the child was born. The child was born on August 18, 1939, and the appellant

finally left the respondent on October 7, 1939, and brought this action some two months later.

Two grounds of cruelty on the part of the respondent were alleged in the complaint and are relied upon by the appellant, and the sole contention here is that the evidence with respect to these matters was such that the court erred in entering judgment after motion for nonsuit. The grounds of cruelty thus relied on are: (1) That the respondent had caused the appellant great humiliation and grievous mental suffering by telling her physician, who was a friend of the appellant, that the appellant was suffering from syphilis and by falsely pretending and stating to this physician that she had been exposed to this disease by her husband; and (2) That she had caused him great humiliation and mental suffering by attempting in public places to prevent the appellant from partaking of certain dishes and foods then being served, by attempting to prevent him from taking more than one drink of intoxicating liquor, and by regulating and regimenting his life by dictating what clothes he should wear.

With respect to the first of these charges of wrongful infliction of mental suffering upon the appellant he testified that in April, 1939, in response to certain inquiries he made, his wife informed him that she was taking salvarsan shots given her by her physician; that shortly thereafter he asked her physician why these shots were being given and was told that his wife had informed the physician that she had gone to the appellant's doctor and had by him been informed that the appellant "had a one plus Wasserman"; that he informed this doctor that his own doctor had taken no tests of him since before the marriage; and that the tests were then negative, both as to the Wasserman and Kahn tests. The respondent testified that on the night of the day in February, 1939, when the appellant left her the first time she went to the appellant's physician for the purpose of ascertaining if he knew of any reason why she should not have a child; that this doctor informed her that as far as he knew the appellant's blood was clean and there was no reason why he should not have a child, that he had made a premarital examination and tests for the appellant, and that while he could not discuss the details without the appellant's permission he could tell her that everything had been all right except for a one plus Kahn, which was not a positive

indication of syphilis; that she went to her own doctor the next day and told him what the appellant's physician had said to her; that her physician recommended shots of salvarsan as a precautionary measure for the protection of herself and the unborn child; and that she took the shots. This is strongly corroborated by the testimony of the appellant's physician, who testified that the respondent came to him on this occasion "and she was trying to find out the possible reason why Mr. Nason was leaving her"; that he told her there was no reason why she should not have a baby; that he may have told her that the appellant had a one plus Neisserian fixation test; that such tests are used in gonorrhea cases and "if it was a one plus I may have mentioned that result to Mrs. Nason"; that he may not have made himself clear and that "if it happened that way I am very sorry I did not explain myself"; and that the gist of the matter discussed was that the appellant did not want the respondent to have a child and she wanted to know if there was any reason why she should not.

In *Dahnke* v. *Dahnke,* 55 Cal. App. 12 [202 Pac. 894], the court said: "By Section 94 of the Civil Code extreme cruelty is defined as 'the wrongful infliction of grievous bodily injury, or grievous mental suffering, upon the other by one party to the marriage.' The language of the statute would seem to import acts directed toward the other party and with a malevolent motive." The court then remarked that "it is conceivable a case might be imagined which would fall within the meaning of the words without such motive." But we think that no such case is here presented. The charge here is that the respondent falsely told her physician, who was a friend of the appellant, that the appellant was suffering from syphilis and that she had been subjected to danger of infection therefrom. The only evidence of anything in this connection is that of her report to her doctor of her conversation with the appellant's physician. Not only was anything she told her doctor a privileged communication, perfectly justified under the circumstances, but it clearly appears that she made the disclosure only for the purpose of protecting the health of herself and her unborn child, and that, at the most, if the respondent did not correctly report to her doctor what she had been told by the appellant's doctor it was merely an error and one that might

easily be made without any wrongful intent. The appellant's doctor admitted that he had told her that some test used on the appellant was one plus and he expressed regret that he had not explained the matter more fully. The only reasonable inference that can be drawn from the evidence is that the respondent had a good reason for doing what she did in going to both doctors, and no inference that she did this wrongfully or with any intention of injuring the appellant or his reputation could reasonably be drawn.

In connection with the charge that the respondent regulated and regimented the life of the appellant with respect to what he might eat and drink and clothes he might wear, the appellant testified that shortly after their marriage the respondent commenced to tell him what amount he should drink and what things he should eat, "going into the amount of calories I was taking on during the day, and things like that"; that during the fall of the year 1938 they frequently visited another couple; that while they did not do a lot of drinking they would possibly have a highball before a meal; that on these occasions trouble usually came up over the matter of drinking and eating; that quite often his wife would snatch a highball from his hand and either give it back to her hosts or drink it herself; that "when it came to food she would see to it my food was prepared the way she wanted in the kitchen when they were preparing the food and when it was being served at the table she would see to it that the dishes I wasn't supposed to have weren't put where I could get them"; and that she would do this "largely by acting" although she would sometimes say that he had had too many calories. While he testified that his wife would usually allow him to have but one cocktail he further testified that on one occasion at a dinner at the home of a friend, a fruit cocktail was served with just enough brandy in it to give it a flavor and his wife objected to his eating it and embarrassed him considerably and also embarrassed their hosts. On another occasion, while they were having dinner at the International Country Club, after he had had a glass of wine his wife told him he could not have any more and while he was trying to pour another glass she grabbed hold of the bottle, as a result of which some of the wine was spilled, and that there were a lot of people present "which is very embarrassing." He further testified that his wife left standing orders with a restaurant where he

frequently ate that he was not to have certain things, that when he had potatoes he was not to get bread, and that he was not supposed to eat certain other things, and that she ''enforced those regulations''; that he ate his noon lunch at his drug store; that she brought lunch to him; that he was supposed to drink milk at noon but it had to be skim milk; and that in the presence of the customers his wife would pour the cream off a bottle of milk and pour the rest of the milk out for him ''which was rather embarrassing to me because I have reached mature years.'' He further testified that his wife would lay out his clothes for him instead of permitting him to choose his own clothes from the closet and his own socks and shirts from the bureau drawers, that on one occasion when his brother gave him a watch chain for Christmas she wanted it exchanged for another chain, and that finally, ''rather than to stem the tide'' his brother exchanged the chain. The appellant was not asked what effect these embarrassing and humiliating matters had upon his health, but in reply to a question as to its effect upon his ''nature and happiness,'' he replied: ''Well, it completely ruined any happiness I had and it has had an influence on my work at the store. I put in long hours and filling prescriptions requires steady nerves and concentration and accuracy, which was hard to do after staying up most of the night arguing and finding fault and the charges of syphilis all caused me to lose my affection completely and confidence.''

The evidence justifies the inference that the appellant drank too much, a fact which he admitted in his letter to the respondent's father, and he admitted that he was getting too fat. The matters involved in the second charge of mental cruelty are largely trivial and are entirely insufficient to support a finding of such cruelty within the meaning of the statute, especially in the absence of any evidence of their injurious effect upon the physical and mental health of the appellant. There is no evidence that such regulation of his eating and drinking as appears was not beneficial to the appellant, and a large part thereof seems to have been acquiesced in by him. The only active outburst on the part of the respondent, in grabbing a wine bottle on one occasion, may well be explained by the condition she was in and possibly by the condition he was in. The appel-

lant even complains of a degree of wifely ministration in laying out his clothes which most of us would be glad to obtain. ██ The question whether grievous mental suffering has been inflicted is a pure question of fact to be determined from all of the circumstances of each case and not from a part of them. (*Barnes* v. *Barnes*, 95 Cal. 171 [30 Pac. 298, 16 L. R. A. 660].) ██ After reading all of the record it seems hardly possible that any judge could have considered the evidence sufficient to support a finding of extreme cruelty on the part of the respondent. Having in mind the well established rules surrounding the granting of nonsuits, no good reason appears why a decision in this case should have been postponed until after evidence was produced on behalf of the defendant; the trial judge had to pass upon the sufficiency of the evidence produced by the appellant; and, in our opinion, in such a case the technical rules of nonsuit did not require the judge to shut his eyes to the obvious or to believe what the appellant's evidence in its entirety shows to be not true.

The judgment is affirmed.

Marks, J., and Griffin, J., concurred.