[Civ. No. 15925. Second Dist., Div. Two. Dec. 3, 1947.]

ALFRED J. HILL, Respondent, v. BRYAN HOUSTON HILL, Appellant.

Baldwin Robertson and Guy Richards Crump for Appellant.

Hill, Morgan & Farrer, Charles P. McCarthy, William S. Scully and Elliott H. Pentz for Respondent.

WILSON, J.—This is an appeal from an interlocutory decree of divorce granted to respondent on the ground of extreme mental cruelty.

The parties were married on December 12, 1944, and separated on December 23, 1945. At the time of the marriage respondent was 63 years old and appellant had reached the age of 54 years. Prior to 1927, appellant had been a client of respondent's law firm and in that year was employed by them as a secretary; later she became respondent's private secretary. Respondent's first wife had died about six years prior to the marriage. Respondent had one child

of the previous marriage, a daughter, who was married to William H. Harvey, who was a lieutenant commander in the United States Navy. In the early part of October, 1945, Mr. Harvey received his discharge from the Navy. Due to the housing shortage Mr. and Mrs. Harvey were unable to find a home and respondent, with appellant's consent and approbation, invited them to reside in the Hill home until they could find an abode of their own.

1. *The facts as found by the court.* The events leading to the separation and divorce are related in the findings as follows:

(1) At the time of the marriage of respondent and appellant, and for approximately four years prior thereto, respondent was suffering from hypertension in an acute degree, a fact which was known by appellant before, at and during the time of the marriage. Mental upset and domestic discord detrimentally affects the health of a person having such a physical ailment, a fact also known by appellant before, at and during the time of the marriage.

(2) Respondent continued to suffer from his ailment from and after the date of the marriage and continously until the commencement of the action, a fact within appellant's knowledge.

(3) Appellant, by her acts and course of conduct, treated respondent in an extremely cruel manner and wrongfully inflicted upon him grievous physical and mental suffering which materially and adversely affected his health and well-being.

(4) Between July 5 and August 1, 1945, a cousin of appellant visited at the home of the parties. During the night and early morning hours of July 31-August 1, the cousin, accompanied by a male companion whose name and identity was not known to her or to respondent or appellant, indulged in an orgy of drinking intoxicating beverages and sexual misconduct in the living room of the home of the parties to this action, causing a commotion and disturbance. Appellant, upon observing a substantial portion of her cousin's conduct, did not remonstrate with her or express objection to her conduct but was indifferent thereto.

(5) About October 5, 1945, Mr. and Mrs. Harvey, with appellant's prior knowledge, consent and approval, took up temporary residence in the home of the parties. Thereafter and continuously until the commencement of this action they,

with the cooperation of respondent, endeavored without success to procure living accommodations for themselves commensurate with their financial ability. Commencing about November 1, appellant began and thereafter continued to exhibit a studied and deliberately hostile, unfriendly and provoking attitude and course of conduct toward Mr. and Mrs. Harvey and toward respondent whereby the domestic life and conjugal relations between respondent and appellant were substantially and materially disturbed, and she maintained a consistent state of confusion, turmoil and contention manifested by the following acts: (a) By marking the classified section of a daily newspaper relating to apartments for rent and leaving it where it would inevitably be seen and with intent that it should be seen by Mr. and Mrs. Harvey and which was seen by them and by respondent; (b) by complaining in the presence of respondent and Mr. and Mrs. Harvey on an average of three or four times a week at the evening meal that cooking plans and preparation of meals were disrupted because the Harveys required special food and dishes, when in fact such was not the case, but the Harveys on repeated occasions requested that their meals be prepared in any manner suitable to the desires and wishes of appellant except that Mr. Harvey did not desire salads or fresh fruit to be served to him; (d) by instructing the house servant not to serve butter to respondent and appellant which had been provided for the use of all the household by the Harveys, and thereafter going into a hysterical rage and placing a ridiculously large and abnormal amount of butter on the plates for each of the four persons; (e) by refusing from about November 1, 1945, until the commencement of this action to associate with respondent and the Harveys around the home and by wilfully withdrawing to her bedroom and there remaining alone contrary to the express wishes and desires of respondent, although respondent requested her to join and be with them in the den; (g) *by failing and refusing to furnish the Harveys with adequate clean bed linen although there was an ample supply thereof in the house, all of which facts were known to respondent; (h) by unreasonably refusing to direct the household servant in the preparation of a steak dinner for which Mr. Harvey had provided the steaks, compelling re-

---

*The lettered divisions follow the lettering of the court's findings which in turn are in accord with the subparagraphs of the complaint.

spondent to assume direction and control of the servant for such purpose, and by withdrawing herself to a portion of the house other than that then being used by respondent and the Harveys, shunning their society until dinner was prepared; (i) by becoming enraged on one occasion without reason or justification upon entering the living room of the home where she found the Harveys eating their evening meal before the fireplace, although they had done so upon the express invitation of respondent; (j) by instructing, without justification, the household servant to do no work in the upstairs portion of the house for a period of three days with the design and intent of causing embarrassment and discomfort to respondent and the Harveys; (k) by frequently repeating in the presence of respondent and the Harveys that "no house is big enough for two families"; (m) by suggesting on several occasions between November 1 and December 23, 1945, in the presence of respondent and the Harveys, that Mrs. Harvey assume control and direction of the household, the planning of the meals and the direction of the servant; respondent, with the express concurrence of Mrs. Harvey, disagreed with the suggestion, and told appellant that she should control and direct such things; thereafter appellant repeated her previous suggestions and complying with her request respondent procured Mrs. Harvey's consent to the proposed arrangement; whereupon appellant stated, in substance, that she had no rights in the place and that everybody was given consideration except her. Upon respondent's statement to appellant that the latter's course of conduct toward him and the Harveys was embittering him so that he could not have the same feeling toward her she said "I am through, I am quitting and I am getting out"; (n) by stating in substance on December 23, 1945, immediately following the occurrence last above related, after respondent had requested her to take three or four days to think things over, "I don't want any time to think this over, I am through, I am quitting and am getting out tonight"; (o) by failing and refusing without justification between December 23, 1945, and February 15, 1946, to eat any meals in the home except on December 25, or to associate in any particular with respondent or the Harveys, although on several occasions respondent asked her to join with him and the Harveys at the evening meal; (p) by stating to respondent, on or before December 27, when

the latter requested her to speak with the household servant and assist in composing his difficulties, unrest and dissatisfaction, "I am no Oriental, but I will do as you want me to do, but not through any affection for you, for that is past and gone and I'm through."

2. *The facts and the evidence sustain the decree of divorce.* Appellant belittles the acts found by the court to have been committed by her and contends that they are so trivial and unimportant that neither one alone nor all together constitute extreme cruelty and are insufficient to sustain a decree of divorce on that ground. A trickle of water from a mountain spring is in itself incapable of causing damage but when joined by numerous others they together create a raging torrent that carries ruin and devastation wherever it flows. So it is with appellant's acts and conduct. If it be conceded that any one of appellant's acts, taken singly, should be passed without notice, nevertheless all her acts together, considered in connection with her continuous general hostile attitude toward respondent and his daughter and son-in-law, created an unbearable situation to a man who, within appellant's knowledge, was suffering and for several years previously had suffered from hypertension to an acute degree. The court cannot determine whether grievous mental suffering has been inflicted on respondent by merely considering each act separately. Whether respondent suffered grievously is a question of fact to be determined from all the circumstances and not from a portion of them. (*Nason* v. *Nason,* 48 Cal.App.2d 500, 506 [120 P.2d 37]; *Barnes* v. *Barnes,* 95 Cal. 171, 177 [30 P. 298, 16 L.R.A. 660].)

The court found that respondent's ailment was known by appellant before, at and during the time of the marriage and that she knew that a mental upset and domestic discord detrimentally affected the health of a person suffering with that ailment. Knowing that peace and tranquillity were necessary to respondent's health and well-being, appellant continued her hostile attitude until respondent was led to say: "Don't you see that this course of conduct toward Marjorie and Bill and myself is embittering me where I can't feel the same toward you?"

Appellant concedes the rule, as she must, that an appellate court must view the evidence in the light most favorable to respondent, but at the same time she quotes and

asks us to rely on evidence given by her and her witnesses that is favorable to her claims and not to respondent's cause of action and is contradictory of the evidence sustaining respondent's allegations that have been found by the trial court to be true—in other words she wants us to reverse the rule and to view the evidence most favorably to her.

The court found that appellant's acts and conduct directly, proximately and substantially caused great humiliation, grief and mental anguish and physical suffering with the direct and proximate result that the ends and purposes of matrimony between the parties have been irreparably destroyed and made impossible of fulfillment and accomplishment; that the critical condition of respondent's health, as detrimentally affected by the acts and conduct of appellant and as would be thereafter detrimentally affected if the parties continued to live in the same house, was such as to require that appellant leave the home.

It would be useless to prolong this opinion with a synopsis of the evidence given at the trial consisting of nearly 1,500 pages. It is sufficient to say that all the findings of the court to which we have referred are sustained by substantial evidence.

The Harveys arrived at the home of respondent and appellant on October 5, 1945. On the 7th and 8th, Mr. Harvey began advertising in the newspapers and interviewing friends in an endeavor to find living quarters. Mrs. Harvey visited real estate offices, telephoned to friends and went from door to door trying to find an apartment, an extra room ''or even chauffeur's accommodations in garages.'' From October 20 to November 1, respondent and appellant were absent from the home on a vacation trip. Immediately on their return appellant began the course of conduct related in the findings, which the court found to have been carried on with the intent and purpose of compelling respondent to eject his daughter and her husband from the home or of compelling them to leave, although they had no other place to which they could go and although they had been invited with appellant's consent and approval to remain until they could find lodgings of their own.

Invoking the Scriptural injunction that a man cleave only onto his wife and citing several cases to the effect that the first duty of a man is to his spouse, appellant argues that respondent did not fulfill that duty when he permitted his

daughter and her husband to remain in the home. In our study of the Scriptures we have not encountered a suggestion that a father should turn his daughter from his door when she has not where to lay her head. Thousands of persons have given shelter to relatives upon their return from the service of their country in the late war at much greater inconvenience and sacrifice than is shown to have been suffered in this case and have borne the burden with a degree of graciousness and Christian fortitude evidently alien to appellant's mind.

The cases cited present more extreme situations than that found in the instant case. In *Thomsen* v. *Thomsen,* 118 Ore. 614 [228 P. 832, 245 P. 502, 247 P. 808], the wife was brought to reside permanently in a home occupied by the husband's father, mother, two sisters, brother and sister-in-law. In *Schuster* v. *Schuster,* 88 Utah 257 [53 P.2d 428], where the husband's 16-year-old son abused and assaulted his stepmother, the court said that the act of the husband in permitting those under his authority so to conduct themselves toward his wife as to impair her health constituted cruelty. In the instant case there is no claim that the Harveys abused appellant or that her health had become impaired. In each of the cases of *Kruschke* v. *Kruschke,* 103 Ore. 601 [205 P. 973], *Day* v. *Day,* 84 Iowa 221 [50 N.W. 979], *Cormier* v. *Cormier,* 193 La. 158 [190 So. 365], *Dakin* v. *Dakin,* 1 Neb.Unof. 457 [95 N.W. 781], *Powell* v. *Powell,* 29 Vt. 148, and *Hutchins* v. *Hutchins,* 93 Va. 68 [24 S.E. 903], the wife was required to live permanently in a home with the husband's relatives who insulted, abused and mistreated her. While there was not always harmony between appellant and Mrs. Harvey, their relationship was far from being such as is described in the cases last cited.

The Harveys expected to remain only temporarily. There was no intention of a permanent residence that would interfere with the household. But appellant's ill-feeling seems to have developed almost immediately after their arrival and to have grown in such intensity and at such a rapid pace that respondent's hysterical breakdown was brought on within three months.

Since the trial court's findings of fact are in favor of respondent upon his allegations and against appellant on hers and since the findings are sustained by substantial evidence we cannot disturb them. (*Buckhantz* v. *R. G. Hamil-*

*ton & Co.*, 71 Cal.App.2d 777, 779 [163 P.2d 756] and cases cited.)

The incident of the drinking orgy and sexual misconduct between appellant's cousin and an unknown man occurred long before Mr. and Mrs. Harvey came to reside in the home of the parties. Respondent was shocked and amazed at the unconcern exhibited by appellant on account of this incident and by her failure to remonstrate with her cousin on account of the latter's behavior. It is true that respondent thereafter related the occurrence to some of appellant's relatives but appellant's indifference at the time of the occurrence and her later attempt to condone the act left respondent with a feeling of disgust and his physical condition was adversely affected.

▇▇▇ Appellant contends that in order to constitute extreme cruelty the acts must be directed toward the other party with malevolent intent. "Malevolent" is defined as "disposed to injure; arising from, or indicative of, ill will." (Webster's New International Dictionary, 1947 ed., p. 1489.) Synonyms are stated by the same authority to be "ill-disposed, spiteful, rancorous," and the antonym is "benignant." The acts related with detail in the findings are within the definition of "malevolent" and are well described by the synonyms. Appellant herself does not claim that they were "benignant." Appellant cites on this subject *Dahnke* v. *Dahnke,* 55 Cal.App. 12 [202 P. 894], *Anso* v. *Anso,* 72 Cal.App. 513 [237 P. 814], *Schlecht* v. *Schlecht,* 99 Cal.App. 163 [277 P. 1065], *Nason* v. *Nason,* 48 Cal.App.2d 500 [120 P.2d 37], and *Keener* v. *Keener,* 18 Cal.2d 445 [116 P.2d 1]. We find nothing in these cases justifying a reversal of the judgment or in any manner favoring appellant's case.

▇▇▇ It is not necessary that the injured party prove that the course of conduct of the other spouse was inspired by malevolent motives. (*Keener* v. *Keener, supra,* and *Barngrover* v. *Barngrover,* 57 Cal.App. 43 [206 P. 461].) In the Barngrover case the mental cruelty consisted of constant nagging by an ultrapuristic wife who from good motives was endeavoring to impose her ideas of morals on her husband although he was an earnest Christian man. The court said that nagging from good motives may be just as hurtful as if prompted by any other motive.

We find nothing in the record to support appellant's argument that her acts were induced by respondent. The cases of *Popescu* v. *Popescu,* 46 Cal.App.2d 44 [115 P.2d 208], *Annen* v. *Annen,* 79 Cal.App. 626 [250 P. 580], and *Truax* v. *Truax,* 62 Cal.App.2d 441 [145 P.2d 88], are not applicable to the situation shown by the evidence in this case.

The finding that appellant had been guilty of extreme mental cruelty is sustained by the evidence. The effect of her acts on respondent was aggravated by the fact that he was afflicted with hypertension—high blood pressure. Respondent testified that the occurrence of December 23d was a shock to him; that he went to bed, broke down and wept and slept very little; the next morning he "was just emotionally all to pieces." Mr. Harvey testified that on the morning of December 24 he noticed that respondent was shaking violently and sobbing hysterically. Mrs. Harvey stated that when she came downstairs her father's eyes were red and that he was sobbing and shaking violently. Both Mr. and Mrs. Harvey did all that was possible to calm him, but he continued in an emotional state for a long period.

Two doctors testified concerning respondent's condition. Dr. Stevens testified respondent's hypertension existed prior to the marriage; that in March, 1946, his blood pressure was extremely high, that he was nervous, emotional, had headaches in the back of his head, ringing in his ears and definite symptoms of an increase in the hypertension; that emotion and nervous strain raise the blood pressure within a very short time, particularly where there is a history of previous high blood pressure; that such a condition would mean an eventual arteriosclerosis involving the heart and kidneys and probably an apoplectic stroke if the pressure continued to rise and to remain high. The witness considered respondent's condition to be so serious as to require the service of Dr. Barrow, an expert in the treatment of hypertension. Dr. Barrow testified that he made a careful physical examination of respondent and did the necessary laboratory work; that the medical profession knows no better cause for hypertension than the "effect of things on the nervous system, which causes a tenseness" of the blood vessels; that there can be a hypertension of varying degrees through different days; that respondent's kidneys were doing their work properly and it was therefore not a kidney hypertension; that hypertension may be caused by worry.

From the medical testimony it is manifest that surcease from the turmoil suffered by him is necessary to the end that his health be not further impaired.

 Because of the close relationship of a private secretary and her employer appellant must have known and in fact the court found that she did know of respondent's physical ailment long before the marriage, and she knew that worry or domestic discord had a detrimental effect upon the health of a person so afflicted. Her knowledge of the deteriorating influence of worry on a person who has high blood pressure and her continuance of her conduct remove from further consideration any claim of appellant that her acts were not done with a malevolent intent as that word is defined *supra*.

The intimation in appellant's brief that Mrs. Harvey was interested in breaking up the marriage so that she would inherit her father's entire estate is wholly without foundation. The court did not so find and there is no evidence to that effect and none from which such an inference may be drawn. We have mentioned the fact that respondent and appellant went on a trip shortly after the Harveys arrived and were absent from their home until November 1, 1945; yet appellant's course of conduct began immediately after their return, without allowing sufficient time for the Harveys to obtain a living place. The assertion that appellant's acts, as related in the findings, were directed toward the Harveys and not toward respondent is likewise without foundation. All the acts covered by the findings were either committed in respondent's presence or information concerning them was communicated to him shortly after their occurrence and the court made findings that they were calculated to and did have an adverse effect on his mental and physical health.

 3. *Alleged errors in ruling on the admission of evidence.* Appellant complains of several rulings of the court sustaining objections to questions propounded to respondent on cross-examination. Her contention in this regard may be disposed of without extensive discussion: (1) Respondent withdrew his objections to a number of the questions and offered to answer them. Appellant's counsel declined the proposal, stating "I don't care to repeat the questions at this time." The offer cured any error that the court may have committed in sustaining the objections. It is of no consequence that the objections were not withdrawn until after appellant's motion

for a nonsuit had been denied. ■ (2) Many if not all the questions which gave rise to the rulings were on subjects that had been covered categorically or in substance by answers to other questions or were objectionable as being immaterial or calling for conclusions, or were improper for other reasons. It would serve no purpose to lengthen this opinion by repeating them. ■ (3) The control of cross-examination is within the sound discretion of the court, and its rulings will not be reviewed unless discretion has been abused. (*Melvin* v. *Berendsen,* 7 Cal.App.2d 389, 391 [46 P.2d 189].) We have examined each specification of error and we do not find that the court abused its discretion in sustaining any of the objections.

■ (4) Reversal of a judgment on account of errors will not be ordered unless the entire record shows that such errors have resulted in a miscarriage of justice. (Const., art. VI, § 4½; *Mullanix* v. *Basich,* 67 Cal.App.2d 675, 679 [155 P.2d 130]; *People* v. *Burch,* 46 Cal.App. 391, 398 [189 P. 716]; *Neves* v. *Costa,* 5 Cal.App. 111, 120 [89 P. 860].) The record does not disclose that justice has miscarried. ■ (5) Appellant's cross-examination of respondent covers a wide scope, occupying approximately 250 pages of the transcript. We do not find that the court placed an undue or improper restriction on appellant's efforts to bring out any evidence that might have been in her favor. ■ The burden is on appellant to show that the alleged errors are sufficiently prejudicial to justify a reversal. (*Mullanix* v. *Basich, supra; Santina* v. *General Petroleum Co.,* 41 Cal.App.2d 74, 77 [106 P.2d 60]; *Murphy* v. *Retirement Board,* 49 Cal.App.2d 58, 60 [121 P.2d 101]; *Arnett* v. *Nall,* 51 Cal.App. 194, 195 [196 P. 291]; *Robertson* v. *Weingart,* 91 Cal.App. 715, 726 [267 P. 741].) She has not sustained that burden.

■ 4. *Appellant's objections to the division of the community property.* In discussing this phase of the appeal it must be borne in mind that the divorce was granted to respondent on the ground of the extreme cruelty of appellant and that by virtue of the authority given by section 146 of the Civil Code, the court might have refused any award whatsoever to appellant. After making deductions of several amounts from the community property, the court assigned one-half of the remainder to her, thus exercising the discretion given by the code provision after considering "all the facts of the case, and the condition of the parties." In view of the power of the court to have awarded the entire com-

munity property to respondent if it had refused any award to appellant, our jurisdiction on appeal would have been limited to determining whether, giving consideration to all the facts and circumstances, the trial court had abused its discretion.

Since our power to interfere with an order dividing community property where the ground of divorce is extreme cruelty is limited to a determination of whether discretion has been abused, our consideration of the objections to the deductions made from the community earnings of respondent before division was made between the parties will be limited in the same degree.

Respondent's income was derived principally from his agreed share of the net profits of a partnership engaged in the practice of the law. Since his property was possessed by him at the time of the marriage, it was his separate property and appellant was therefore entitled only to a division of such income as respondent had received during coverture.

By the agreement of the partners, their net profits were divided on June 30 and December 31 of each year. If a partner received any payment other than on these dates, or if any money was paid out of the partnership funds on his account, the amount was charged to him and deducted from his share of the profits on the accounting date.

Appellant has presented seven objections to the computation of respondent's income and to allowances made by the court against the community property.

(a) Objection is made to what she designates as an "after-the-fact accounting" prepared during the trial allowing deductions for expenditures made from a bank account in which separate and community funds had been commingled.

The account from which the court derived its information regarding respondent's income was made up by a certified public accountant, who is also a member of the bar, from respondent's books, bills, receipts and other memoranda, and from the books of original entry, bank statements, checkbooks and stubs of the partnership, all of which were produced in court for examination by appellant and her counsel.

It is sufficient to say, without setting up a debit and credit ledger account in this opinion, that the amounts allowed by the court were chargeable to the community funds. The fact that after the marriage respondent failed to open a new bank account but continued to deposit his community earnings in the old account, the funds in which at the date of the marriage

were his separate property, and to draw checks against it, furnishes no valid objection to the accounting.

The rule relating to community funds argued by appellant is applicable where it is not possible to trace the community and separate funds and to segregate one from the other. The accountant was able to trace funds into and out of the account and to make up a statement therefrom showing the source of the funds and the purpose of the expenditures. Community indebtedness was properly charged against the community funds whether the latter were in a community account or in an account in which respondent's separate funds had been deposited prior to the marriage.

The marriage was contracted only 19 days before the end of the year 1944. Although much, practically all, of the income of the last half of 1944 had been earned before marriage, the total amount received by respondent on December 31, 1944 was considered as and credited to community property. Funds earned by respondent and distributed to him by the partnership prior to the marriage were not community funds and were properly excluded from the accounting.

Appellant states that on certain dates the amount of the expenditures for items claimed by respondent to have been for community debts exceeded the total of the amounts that were community funds and argues that the expenditures in excess of the community funds were chargeable to respondent's separate property. The fallacy of the argument is shown by the mere statement of it. If respondent paid community debts out of his separate funds at a time when the community funds had been exhausted, he was entitled to reimbursement when the community account was replenished.

(b) Appellant contends that deductions as community expenses were erroneously allowed for purposes chargeable only to respondent's separate funds:

(i) The federal and state income taxes for 1944 were allocated by the court between the community and separate earnings, charging taxes to the community in the proportion that the community earnings bore to the entire income of respondent for that year. This was an equitable apportionment. There was no obligation on respondent to pay the community taxes out of his separate funds. The income tax for 1945 was properly divided in half since the marriage existed during the entire year and respondent's earnings for the year were community property.

(ii) Objection is made to the charge of the estimated income tax for 1946 against the community funds, appellant claiming that unless the judgment is reversed, she cannot recoup her interest in the community money that was applied on the income tax on respondent's separate income. This objection is disposed of by the provision in the judgment which requires an accounting for the period from June 30, 1946, to the date of the final decree of divorce. If appellant is entitled to any recoupment, she will receive it in the final accounting.

(iii) Complaint is also made that the attorney's fees awarded to appellant and the costs of the present litigation were improperly made from community funds. First, such costs are a proper charge against the community property. In cases where the husband has no separate property, the community estate is the only source from which the costs can be paid. Second, the order must be considered as within the discretion vested in the court in making a division of the community property as hereinbefore discussed.

(c) Error is asserted in that the court adjudged real property alleged to have been partially paid for out of community funds to be respondent's separate property. In 1925, respondent purchased a one-half interest in a tract of real property, paying part cash and giving a purchase money obligation for the remainder. This obligation was paid in 1928 with money borrowed from the King estate. The King note was renewed from time to time and was paid June 27, 1945, by check of respondent's law firm and the amount was charged to his account.

Respondent did not, as asserted in appellant's brief, use community money to purchase real estate and claim the property to be his separate estate. It was his separate property and was not paid for with community funds. He had purchased and paid for the property years before the marriage. The King note was not a purchase money obligation. It was an ordinary indebtedness incurred by respondent, it was his separate obligation, and when paid it was not charged to the community.

Appellant states in her brief that respondent's accounting furnished at the trial showed ''his obligation to the funds in dollars rather than in real estate of an increased value.'' The fact that the property, separate when purchased, was sold for a profit after the marriage did not entitle appellant

to a community interest in the profit. The case of *Maskuns* v. *Maskuns,* 93 Cal.App. 27 [268 P. 1093], is not in point since in that case separate and community property had been so commingled as to render it impossible to trace the funds. Such conditions do not exist in the instant case. The cases of *In re Bauer,* 79 Cal. 304 [21 P. 759], and *Schuyler* v. *Broughton,* 70 Cal. 282 [11 P. 719], are likewise inappropriately cited.

(d) Appellant asserts that shares of the capital stock of Central Investment Company are community property and that the court erred in declaring them to be the separate property of the respondent. Respondent purchased the stock prior to his marriage to appellant with funds advanced to him by the partnership out of fees earned by the firm in 1944 before the marriage. All receipts of the partnership that were distributed to respondent previously to the marriage were earned prior thereto and were his separate property. Since the Central Investment stock was purchased before the marriage with money earned and received by the firm and advanced to respondent prior thereto, it was the latter's separate property.

(e) Appellant contends that she is entitled to an adjudication that additions to the capital assets of the law partnership during the marriage are community property and that she should be awarded an interest therein. The evidence showed that there had been additions to the office furniture, carpets and library between the date of the marriage and the time of the trial. Appellant asserts that she did not claim the right to have any specific item of fixed assets to be declared to be community property but that the court should have taken into account the diversion of community cash into the purchase of the fixed assets. The court was correct in sustaining objections to questions addressed to that subject as well as to those seeking to ascertain whether the firm had acquired any new business after the marriage and whether the firm had moneys that would otherwise be distributable to respondent.

A partner's right in specific partnership property is not community property. (Civ. Code, § 2419(e).) Therefore, respondent's interest in the office furniture and library and in the undistributed partnership property of any kind was not subject to division by the court. Respondent's interest in the partnership assets did not entitle him to any particular

portion of such assets, his right thereto being only equitable and his claim enforceable only through an equitable action for an accounting. (*Clarke* v. *Fiedler,* 44 Cal.App.2d 838, 848 [113 P.2d 275].) A mere expectancy is not subject to division as community property. (*French* v. *French,* 17 Cal. 2d 775, 778 [112 P.2d 235].) In dividing property incidental to the granting of a divorce decree, the court is limited by the amount of property in its hands for division. That which does not exist cannot be divided. (*Secondo* v. *Secondo,* 218 Cal. 453, 458 [23 P.2d 752].) Since respondent had no enforceable interest in the partnership assets until his share should be determined by an accounting, with or without an action in court, appellant could acquire no right thereto in the absence of such accounting. Her right in the property could be no greater than her husband's.

(f) It is claimed that the findings as to the community property do not sustain the conclusions of law and that the conclusions do not support the judgment. The finding of the amount of community property as of June 30, 1946, is followed by a conclusion of law as to the same amount but as of June 30, 1945. Clearly, there is a typographical error in stating the year in the conclusions as 1945 instead of 1946. The case was tried in 1946, the accounting was made to June 30, 1946, and the judgment provided for an accounting from June 30, 1946, until one year after entry of the interlocutory decree.

(g) Error is assigned in allowing the certified public accountant heretofore mentioned to testify as an expert as to the allocation of the income taxes as between respondent's separate estate and the community property. We have previously held that the court adopted the correct method in determining the amount of the income taxes to be charged against each class of property. If the court was in error in receiving the evidence, a question that we need not decide, the error was immaterial in view of the fact that the court properly allocated the taxes.

We find no abuse of discretion in any part of the accounting as made by the trial court. The deductions from the community income before a division was made were proper. Furthermore, since it was within the power of the court to divide the property in such proportions as it deemed just (Civ. Code, § 146), the deductions must be considered to be a part of the division and allocation of the community property.

■ 5. *Respondent's claim for further deductions.* Respondent contends that several amounts should have been deducted from the community funds in addition to those allowed by the court before a division was made. He has not appealed from any portion of the judgment and his contention, therefore, cannot be considered.

Judgment affirmed.

Moore, P. J., and McComb, J., concurred.