[Civ. No. 20065. Second Dist., Div. One. Oct. 18, 1954.]

ESTHER W. KENNEY, Appellant, v. EARL BENTON
KENNEY, Respondent.

Denis Evarts Bowman and Henry O. Wackerbarth for Appellant.

Dee Holder for Respondent.

MOSK, J. pro tem.*—Although prevailing in the divorce proceeding, appellant-plaintiff-wife has expressed dissatisfaction with the ascertainment of separate and community property, and has appealed. This case is not new to the District Court of Appeal, a previous appeal having been determined in 1950 (*Kenney* v. *Kenney,* 97 Cal.App.2d 60 [217 P.2d 151]).

The Kenneys were married on June 4, 1923, and separated February 2, 1947. Their four children reached majority

*Assigned by Chairman of Judicial Council.

prior to conclusion of the present proceeding. After trial in 1948, on appeal the judgment was reversed with instructions, and the retrial concluded in late 1952.

For some time before the marriage, respondent held an eighth interest in a partnership known as the Union Drilling and Petroleum Company, which was engaged in the oil drilling and producing business. The principal asset of Union was a contract to drill a well for Invader Oil Company, for which it was to receive $23,500 in cash and a 32½ per cent royalty interest in all oil produced from a well known as Miller 1-A Well.

Shortly prior to the marriage the partners incorporated, and respondent received one-eighth of the 1,000 shares of issued stock. Contrary to the first trial court, his 125 shares were held to be separate property by the reviewing court, and the cause remanded to ascertain the revenue received from that separate property and to determine the amount invested in community property.

The history of this oil enterprise is complicated, as its form fluctuated with its fortune. In 1932 it became financially distressed, and its assets were transferred to one Edythe McCaslin, wife of W. E. McCaslin who subsequently acquired all Union stock except that owned by respondent. In 1939, Edythe McCaslin transferred the assets to a new partnership, known as the McCaslin-Kenney Company, in which respondent retained a one-eighth interest.

Meanwhile respondent was employed by this oil company, first by the original partnership, then by the corporation until February, 1932, and after 1939 by the new partnership. In addition he received a salary from Invader Oil Company from June, 1923, through May, 1924, and again from 1941 to 1949. His total earnings during the entire marriage were a gross of $64,786.91. During that period, the living expenses of his family were $110,740.21. Testimony indicated his gross income from the oil properties was $137,919.54, with a net of $66,569.18. All 'of his funds, regardless of source, were deposited in one bank account.

The trial court found certain property, both real and personal, to be community property, valued at approximately $51,600. We are here concerned with a number of items declared by the court to be separate property, and totaling approximately $29,600 in value.

Our first problem is to define the authority of the trial court upon retrial of an action after appellate review. This

becomes significant since the two trial courts reached conflicting conclusions on the character of certain property.

The role of the trial court, upon retrial of a case after review and reversal with instructions, has been well defined as "but to follow the directions thus given." (*Carter v. Superior Court*, 96 Cal.App.2d 388, 391 [215 P.2d 491].) In *Rice v. Schmid*, 25 Cal.2d 259 [153 P.2d 313], the court stated (at p. 263): "Where a reviewing court reverses a judgment with directions to determine damages in accordance with the rules set forth in its opinion and to enter judgment for the plaintiff, the trial court is bound by the directions given and has no authority to retry any other issue or to make any other findings. Its authority is limited wholly and solely to following the direction of the reviewing court." These directions must be followed "explicitly," said the court in *Breznikar v. T. J. Topper Co.*, 46 Cal.App.2d 435, 439 [116 P.2d 176]. The directed judgment of the reviewing court is the law of the case and is controlling on the jurisdiction of the trial court. (*Buttram v. Finley*, 73 Cal.App. 2d 536, 541 [166 P.2d 654].)

It is not inconceivable that the directions of a reviewing court may be imperfect, or impractical of execution. Under those circumstances the aggrieved party has his remedy in a petition for rehearing. But the trial court thereafter "may not exceed the specific directions of a court of review in remanding a cause after a reversal of the judgment on appeal and add thereto conditions which it assumes the reviewing court should have included." (*English v. Olympic Auditorium, Inc.*, 10 Cal.App.2d 196, 201 [52 P.2d 267].)

"The directions of a court of review for the modification or reversal of a judgment, when the cause is not remanded for a new trial, may ordinarily be divided into two general classes. The appellate tribunal adopts a written opinion determining the issues on appeal and directs that the judgment be modified or reversed accordingly, in which event the opinion becomes a part of the decision and instructions, vesting the trial court with a sound discretion to determine what the reviewing court decided thereby. In the other class of instructions the appellate court may adopt a written opinion determining the issues on appeal and modify or reverse the judgment, specifically directing the lower court with respect to particular issues. In the last-mentioned class of cases the trial court has no discretion to interpret the opinion of the appellate court, but, on the contrary, it is

bound to specifically carry out the instructions of the reviewing court. Under such circumstances, any material variance from the explicit directions of the reviewing court is unauthorized and void.'' (*English* v. *Olympic Auditorium, Inc., supra.*)

Bearing in mind the foregoing admonitions, the trial court here was limited to the instructions of the District Court of Appeal. In its decision, the court said (97 Cal.App.2d at p. 61): ''On this appeal from the judgment there are only two issues: (1) respondent having discharged a community debt due the estate of her deceased father in the sum of $6,000, the judgment awarded her a lien against the property which had been under mortgage to her father. Appellant contends that such part of the judgment is error. (2) The court found that appellant's interest in the oil drilling partnership and in the assets of same and also 125 shares of the capital stock of Union Drilling and Petroleum Company are community property. Appellant contends that this finding is not supported.'' After discussion of those two issues at considerable length, the court did not reverse the judgment for a trial de novo, but concluded (p. 66) ''that the judgment is reversed with instructions to ascertain from the evidence (1) the amount of revenues received by appellant from his shares in the Union Drilling and Petroleum Company, (2) the amount thereof invested in the community property of the parties, and (3) whether in the light of such determination appellant should be required to contribute more to respondent for the care of the child than the sum designated in the judgment. . . . (4) The judgment will be corrected also to order that the defendant shall out of the community funds pay plaintiff the sum of $6,000 or out of his separate funds the sum of $3,000.''

(For accurate comprehension, it should be borne in mind that the appellant in the previous appeal was the defendant-husband, who is the respondent in the instant proceeding.)

██ It is clear that all property acquired by the husband or wife after marriage is community property and the burden is on the party seeking to establish that such property is in fact separate. (*Falk* v. *Falk*, 48 Cal.App.2d 762, 767 [120 P.2d 714].) ██ There is a presumption that the post-marital property is community (Civ. Code, § 164) but this is a presumption that may be overcome by a preponderance of *contra* evidence. The reviewing court has held, and it is now the law of the case, that the Union stock was separate property.

█ The law is equally clear that all property owned by a husband at the time of his marriage, and the rents, issues and profits thereof are his separate property (Civ. Code, § 163.) This property does not change its character as a result of the marriage nor by its mere use in the marital relationship. As pointed out in *Hiatt* v. *Seyster*, 122 Cal.App. 612, 615 [10 P.2d 473], after defining separate property and its productivity in sections 162 and 163, the Civil Code proceeds in section 164 to define "all *other* property" as community, thus indicating its intent to retain inviolate the separate character of premaritally acquired property.

█ Separate property may be changed into community property by agreement between the parties, and persuasive evidence of such an understanding will rebut any presumption arising from the form in which the property has been held. (*Schindler* v. *Schindler*, 126 Cal.App.2d 597, 602 [272 P.2d 566]; *Irwin* v. *Zuver*, 107 Cal.App.2d 245 [236 P.2d 834].)

For the years 1923 and 1924, and 1932 to 1944, the respondent filed joint income tax returns, pooling all his resources for the purpose of tax computation. He filed no separate returns, or returns on property claimed to be separate, for any taxable year. This effort to procure a tax advantage, contends appellant, constituted a conversion of any income which may have been separate property for those years into community property.

█ One persuasive circumstance that may be taken into consideration as evidencing an agreement is the income tax returns and the manner in which the property is described therein. (*Heck* v. *Heck*, 63 Cal.App.2d 470, 475 [147 P.2d 110].) However, the returns are not conclusive evidence of the nature of the property, and if the trial court finds contrary evidence to preponderate, the finding will not be disturbed on appeal. The finding is not unreasonable here, where except for the tax returns, there was no affirmative testimony concerning an agreement and respondent denied the intent to consummate an agreement.

█ Even without agreement, separate property may become community property by the process of commingling in such a manner as to make segregation impossible. (*Falk* v. *Falk*, 48 Cal.App.2d 762, 766 [120 P.2d 714].) █ But if the property, or the source of funds with which it is acquired, may be traced, a mere change in form or identity during marriage will not alter its separate property status. (*Huber*

v. *Huber,* 27 Cal.2d 784, 791 [167 P.2d 708].) The same rule applies to funds. ▇▇▇ If the exact amount of money allocable to separate property and to community property deposited in the same bank account can be ascertained, the property is not so commingled that all of the funds become community property. (*Thomasset* v. *Thomasset,* 122 Cal.App. 2d 116, 124 [264 P.2d 626].) The court properly found here that funds in and out of the commingled bank account could be traced.

Respondent testified, and his records appeared to substantiate his conclusion, that for every year of marriage the family expenses exceeded his salary and other community income. He consistently resorted to separate funds in order to meet the deficit. It follows, he maintains, that there were no community funds with which any of the property in dispute could be acquired and therefore all of it necessarily must have been obtained with separate funds.

Such contention is not unique. It was sustained in effect in *Estate of Tompkins,* 123 Cal.App. 670 [11 P.2d 886]; *Estate of Ades,* 81 Cal.App.2d 334 [184 P.2d 1]; *Logan* v. *Forster,* 114 Cal.App.2d 587 [250 P.2d 730], and *Thomasset* v. *Thomasset, supra.*

▇▇▇ Unless the contrary is shown, it is presumed that money used in the maintenace of the family is drawn from community funds before there is an encroachment on separate property. (*Estate of Cudworth,* 133 Cal. 462, 468 [65 P. 1041]; *Logan* v. *Forster, supra.*) ▇▇▇ Evidence that there was no excess of community income over living expenses has been considered an effective manner of demonstrating the separate character of property remaining. (*Estate of Ades, supra.*) ▇▇▇ In fact, if a husband uses separate funds for family expenses at a time when the community funds are exhausted, in the absence of an agreement to the contrary or evidence of intention of an agreement to make a gift, he is entitled to reimbursement when the community account is replenished. (*Hill* v. *Hill,* 82 Cal.App.2d 682, 698 [187 P.2d 28]; *Thomasset* v. *Thomasset, supra.*)

Appellant maintains that in the previous appeal no specific challenge was offered to the first trial court's finding that virtually all property was community, except the 125 shares of Union stock. The second trial court, therefore, it is urged, was bound by the previous finding, and is in error in determining several items, in the first trial held to be community, now to be the separate property of respondent.

This contention overlooks the conclusion of the District Court of Appeal (97 Cal.App.2d at p. 65) that the first trial court erroneously excluded evidence by which respondent attempted to trace separate revenues. "Where adjudication of the rights of litigants depends upon a determination of whether the property involved is community," said the court, "upon concluding its investigation the court will determine the extent to which the revenues if separate property have been used to improve or protect the community estate. Where amounts of money taken from the separate property can be definitely ascertained, there is not then such a commingling of funds as will require the court to impress all the property as community. (*Huber* v. *Huber*, 27 Cal.2d 784, 793 [167 P.2d 708].) Inasmuch as the corporate shares are the separate property of appellant, it was incumbent upon the court to receive all competent evidence offered by appellant that tended to show the investment of his moneys in the community property and if such funds are definitely traced to make such provision in the judgment as will protect appellant from losses by reason of such expenditures."

"Such provision," as suggested in the decision, may be made, once the source of funds has been traced, by declaring the property in question to be separate property, or it may be found to be community impressed with a separate property lien. The trial court here generally chose the former course. We cannot find it to be erroneous, except as hereinafter specified.

### The Torrance Wells

The Torrance wells were purchased October 9, 1930, from the Gilmore Oil Company for the sums of $5,000 for the wells and equipment and $500 for accumulated oil; $1,500 was paid down, another $1,500 on January 12, 1931, and the balance of $2,500 on February 20, 1931. The first payment was made from the bank account into which both the community property earnings of respondent and his separate property Union dividends had been deposited. The burden was on respondent to establish clearly the character and disposition of those funds (*Estate of Duncan,* 9 Cal.2d 207, 217 [70 P.2d 174]). The trial court found that he had met the burden.

The first payment of $1,500 was made at a time when, the documentary evidence in the record disclosed, community living expenses exceeded community income. The presumption being that respondent used community funds in

the bank for living expenses, there were none available on October 9, 1930, from which the Torrance wells purchase could have been made. Therefore the down payment necessarily was made from the remaining, or separate, funds in the bank account. As a general rule, the character of the property as separate or community is fixed as of the time it is acquired and changes only in some manner recognized by law, as discussed hereinbefore. (10 Cal.Jur.2d 676.) Thus the Torrance wells were separate property at the time of their purchase.

Without setting forth the figures in minute detail, although we have followed them carefully and laboriously, the second payment on the Torrance wells in the sum of $1,500 was made also at a time when family expenses exceeded community income, thus leaving only separate funds out of which the payment could have been made.

The third payment involves a somewhat different situation, for when the final $2,500 became due, respondent borrowed from A. F. Weible, appellant's father. For this money, respondent signed a note and as security therefor he executed and delivered to Weible an assignment of his Torrance interests. Appellant joined in the assignment. The note was not paid upon maturity and on February 29, 1932, a new note in the sum of $2,575 was executed by both appellant and respondent, together with another chattel mortgage on all personal property upon the Torrance premises. The note was ultimately repaid out of the same bank account heretofore discussed, and also at a time when the excess of living expenses over community income indicated only separate funds remained in the account.

 It is clear that property purchased with separate funds is separate property. The character of the property would not necessarily be altered because the appellant joined in signing the note and assignment. It seems reasonable to conclude, as the trial court apparently did, that the loan was made upon the faith and credit of separate property, since the separate property was posted as security. For a similar factual situation see *Stewart* v. *Stewart*, 113 Cal.App. 334 [298 P. 83]. In another comparable case, *Flournoy* v. *Flournoy*, 86 Cal. 286 [24 P. 1012, 21 Am.St.Rep. 39], it was said (p. 293): "The fact that the defendant joined in the note and mortgage given to secure the repayment of the money borrowed does not affect the question. The real security was (the) separate property; . . ."

From all of the foregoing, it appears the trial court properly concluded the Torrance wells were the separate property of respondent.

### Respondent's Services on the Torrance Wells

Appellant contends that respondent performed personal services on the Torrance Wells, and that if the wells are found to be separate property she is entitled to at least one-half of the value of those services. The evidence indicates from the time the wells were acquired in 1930, respondent performed relatively minor services valued at $20 per month. After 1944 his services rendered were worth $50 per month. One hundred and sixty-eight months at $20 and 101 months at $50 totals $8,410.

It was the duty of the trial court to have found the value of respondent's services (*Stice* v. *Stice*, 81 Cal.App.2d 792 [185 P.2d 402]) and to have considered this element in its allocation of property. Respondent asks us to assume this has been done, but since no reference to these services appears in the findings, we are unable to indulge in such assumption. While the activities perhaps were comparatively insignificant, whatever their worth may have been, they deprived the community of that amount of time, effort and return, and cannot arbitrarily be claimed by the separate estate.

Under some circumstances it would be appropriate to ascertain that proportion of profits from the enterprise attributable to respondent's personal services and to consider that proportion to be community property. (*Witaschek* v. *Witaschek*, 56 Cal.App.2d 277, 281 [132 P.2d 600].) But in view of the nebulous character of the services rendered here, it would be extremely difficult, if not impossible, to ascribe any direct relationship between respondent's services and the production of oil from the land. (*Estate of Pepper*, 158 Cal. 619 [112 P. 62, 31 L.R.A.N.S. 1092].) In this case, therefore, the community interest should be measured by the value of the services rendered. (*Cozzi* v. *Cozzi*, 81 Cal.App.2d 229, 232 [183 P.2d 739].)

Appellant should have been awarded one-half of the $8,410 in services expended on the separate property, or $4,205.

### The $9,000 Cash

Defendant sold one of the three Torrance wells for $10,000, depositing $1,000 in his bank account and the other $9,000 was placed in a safe deposit box. Respondent testified he later gave Weible this same $9,000 to use in connection with

the purchase of real property on Hudson Street. The trial court found the sum of $9,000 to be the separate property of respondent and granted a lien on the Hudson property to secure its repayment.

Having found the Torrance wells to be the separate property of respondent, the court necessarily determined the proceeds of the sale of one of the wells to be separate. ■ Profit made upon a sale of separate property is likewise separate property. (*Hill* v. *Hill, supra,* 699-700; *Estate of Barnes,* 128 Cal.App. 489, 491 [17 P.2d 1046]; Civ. Code, § 163.) The cash having been traced into the Hudson Street property, the trial court properly granted a lien on it in favor of respondent.

### Clifton Kenney Trust Deed

■ Respondent purchased a parcel of unimproved real property for $2,500 for his brother, Clifton, and paid some additional sums for plans, receiving from him a note and trust deed dated June 26, 1948, in the sum of $3,500.

It seems clear from the evidence that this money came from Torrance wells' proceeds, which we have heretofore determined to be separate property. Therefore the loan or investment in the Clifton Kenney property would also be separate property.

Appellant has suggested the trust deed transaction was a fiction to conceal respondent's personal interest in the property, and she points to the fact that the sale was negotiated only a few days prior to the first trial. This might be a suspicious circumstance, but it falls far short of establishing fraud with such perspecuity as to require interfering with the trial court's conclusion on a question of fact. But even if respondent were the true owner of the real property, since it was acquired with separate funds, whether title is in his name or that of Clifton is of no consequence in this proceeding.

### Nysewander, Blythe, Weatherwax and Rothwell

The Nysewander, Blythe, Weatherwax and Rothwell participating and overriding royalty interests were acquired at various dates in 1945, 1947, 1948, and here again the funds came from the commingled account. The fact, plus assertions that respondent's testimony was false, and that the tax returns showed the income from these interests to be the property of both parties, cause appellant to resist the trial court's findings that they were separate property of respondent. On the other hand, respondent contended the interests were ac-

quired from Torrance wells' income, his separate property. We see no compelling reason to resolve this factual conflict in any manner other than that reached by the trial court.

## The Torrance Home

Between the first and second trials of this lawsuit, a home at 2351 230th Street, Torrance, was acquired. Appellant contends the property is held in the name of respondent's sister as a subterfuge, and that having been acquired during marriage, the property is community. Respondent testified he advanced $9,865.13 to his sister, he has received repayment of $4,703.54, and the balance is being paid by her personal services as housekeeper at the agreed rate of $100 per month. The advance was made by respondent at a time when his only income was from the Torrance wells.

Appellant's evaluation of respondent's testimony created at best a conflict which the trial court resolved in favor of the latter. We perceive no persuasive reason to disturb that finding.

## McCaslin-Kenney Partnership

Appellant has reviewed at considerable length testimony surrounding creation of the McCaslin-Kenney partnership. She maintains the corporation was insolvent when its assets were transferred to Edythe McCaslin, and that when assigned by her to the new partnership for $6,000, none of that sum was contributed by respondent. From that manner of acquisition by respondent without paying out any of his separate funds, appellant argues, flows the presumption that assets acquired during marriage are community property.

On the other hand, as described hereinbefore, respondent traced the original eight-man partnership into the corporation, then to Edythe McCaslin and finally into the new partnership. Whatever the form of the entity, respondent's interest remained static. That the value of the interest may have had peaks and valleys during this course of travel does not destroy the character of the property.

Here again there was a conflict in testimony, as between respondent's version of transactions on the one hand and contrary tax returns on the other, and as to the credibility of respondent as a witness. Those were matters for resolution by the trial court.

## Bolsa Chica Stock

Respondent purchased 50 shares of stock in the Bolsa Chica Oil Corporation on October 20, 1928, for $1,100. He borrowed

the money from the Westside State Bank and signed a promissory note. The bank held the shares as security and applied incoming royalties toward repayment of the note. In 1929 the note was renewed for $1,300. The balance of the note was paid out of funds from the Aiken royalty, an interest acquired in 1928 but no longer in existence, from a loan on respondent's veterans' insurance from World War I, and $745.56 came from Union dividends.

Respondent has consistently urged that the character of the property must be determined as of the time of acquisition. (10 Cal.Jur.2d 676.) Applying that test here, we are first concerned with the nature of the loan from the bank.

There is a presumption that property acquired on credit during marriage is community property. As stated in *Gudelj* v. *Gudelj*, 41 Cal.2d 202, at page 210 [259 P.2d 656]: "In accordance with this general principle, the character of property acquired by a sale upon credit is determined according to the intent of the seller to rely upon the separate property of the purchaser or upon a community asset. (Cases cited.) In the absence of evidence tending to prove that the seller primarily relied upon the purchaser's separate property in extending credit, the trial court must find in accordance with the presumption."

In the instant situation, unlike the third payment on the Torrance wells, there was no evidence justifying a finding contrary to the presumption. Respondent testified that no financial statement was required by the bank officials, a circumstance that distinguishes this from *Estate of Ellis,* 203 Cal. 414 [264 P. 743]. The conclusion is inescapable that Bolsa Chica, when acquired, was community property.

Payments made on the note, other than incoming Bolsa Chica royalties, were from Aiken, veterans' insurance, and Union. The trial court made no finding that Aiken and the insurance were separate property of the respondent. Since Aiken was acquired during marriage, and insurance payments may have been among community expenses, we cannot baldly assume those to have been separate property sources. The Union dividends were separate, of course.

Thus it follows that payments on Bolsa Chica in the sum of $745.56 out of $1,300 were separate property of respondent and the balance is community. For convenience of calculation and enforcement, the trial court should have found one-half of Bolsa Chica to be separate property and one-half community, the community half in turn to be divided equally.

## Division of Community Property

The trial court awarded appellant one-half of the community property plus $100. She complains that this is parsimonious in view of her prevailing in the divorce proceeding on grounds of extreme cruelty.

It is clear that a party upon whom extreme cruelty has been visited is entitled to more than half of the community property. (*Tipton* v. *Tipton*, 209 Cal. 443 [288 P. 65]; *Quagelli* v. *Quagelli*, 99 Cal.App. 172 [277 P. 1089].) But the amount in excess of 50 per cent is largely in the discretion of the trial court. (*Le Fiell* v. *Le Fiell*, 108 Cal. App.2d 321 [239 P.2d 61].) That discretion must accord with justice in the light of the facts of the particular case and the condition or circumstances of the parties. (*Falk* v. *Falk*, 48 Cal.App.2d 762 [120 P.2d 714].) The code confers upon the trial court a wide latitude in the exercise of its discretion and it will be presumed that such discretion has been wisely and properly exercised. Though an appellate court is clothed with the power of revision under Civil Code, section 148, it will be slow to interfere with this discretion. (*Le Fiell* v. *Le Fiell, supra; Crouch* v. *Crouch,* 63 Cal.App.2d 747, 756 [147 P.2d 678].)

The first trial court divided the property evenly, and appellant here did not appeal from that judgment. Since there was considerably more community property to be halved in the first trial, we do not hold she is estopped from challenging the division now. But we do suggest that under her own views on the circumscription of the second trial court's powers by the appellate decision, no other determination could have been made. In any event, considering all the circumstances we cannot find the division to be improper.

It is, therefore, our conclusion that the judgment must be modified in two particulars only: (1) respondent is ordered to pay forthwith to appellant an additional sum of $4,205. (2) one-half of the Bolsa Chica stock is the separate property of respondent and one-half is community property, the community half to be divided equally between the parties.

As so modified, the judgment is affirmed.

Doran, Acting P. J., and Drapeau, J., concurred.

A petition for a rehearing was denied November 15, 1954, and the petitions of appellant and of respondent for a hearing by the Supreme Court were denied December 15, 1954.