Filed 10/16/15  Marriage of Ziman CA2/1

# NOT TO BE PUBLISHED IN THE OFFCIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re Marriage of RICHARD and DAPHNA ZIMAN. | B252042 |
| | (Los Angeles County Super. Ct. No. BD509102) |
| RICHARD ZIMAN, Respondent, v. DAPHNA ZIMAN, Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark A. Juhas, Judge.  Affirmed in part and reversed in part.

Barnes & Thornburg, L. Rachel Lerman; Akin Gump Strauss Hauer & Feld, Rex S. Heinke, Jessica Weisel; Hersh, Mannis & Bogen, Joseph Mannis and James M. Simon for Appellant.

Geoffrey C. Hazard, Jr., as Amici Curiae on behalf of Appellant.

Wasser, Cooperman & Carter, Dennis M. Wasser, Bruce E. Cooperman, Melanie D. Mandles, Amy L. Rice; Greines, Martin, Stein & Richland, Robert A. Olson, Marc J. Poster and Edward L. Xanders for Respondent.

Richard and Daphna Ziman[1] were married for 19 years and during that time amassed a multi-million dollar community estate. Richard was a successful real estate investor who asserted that he brought $16 million in separate assets to the marriage which he used to create a hugely successful real estate entity known as Arden Realty, Inc. (Arden Realty). After a bifurcated trial on property issues, the court confirmed in Richard as his separate property $32 million in profits from Arden Realty and awarded Daphna the couple's $18 million home and ordered her to make an equalization payment to Richard of $9.6 million.

On appeal, Daphna principally contends: (1) Richard's separate property tracing methodology regarding Arden Realty was legally and factually flawed; (2) the trial should be reopened to determine whether Richard breached his fiduciary duty to Daphna with respect to (a) the Rexford Funds that were the subject of an initial public offering (IPO) shortly after the conclusion of trial and (b) the initial investment in Arden Realty; (3) the community was not liable for certain due-on-death charitable pledges made by Richard; and (4) attorney fees sanctions against Daphna were improper.

We conclude that Richard's tracing methodology was not improper and that the trial court correctly categorized Arden Realty as Richard's separate property. We also conclude that the trial court did not err in denying Daphna's motion to reopen the trial with respect to the IPO of the Rexford Funds. We do conclude, however, that the trial court erred by not ruling on Daphna's claim that Richard breached his fiduciary duty by misleading her during the marriage as to the separate property character of his separate property investments in entities that became Arden Realty. We conclude further that the trial court erred in holding the community liable under Family Code section 1100[2] for certain "due-on-death" charitable pledges for which there was no written consent by

---

[1] We refer to Richard and Daphna Ziman by their first names for the sake of clarity, intending no disrespect.

[2] All further statutory references are to the Family Code unless otherwise indicated.

Daphna. Accordingly, the matter is remanded for further proceedings, including a redetermination of attorney fees, consistent with our holding.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I.     The Parties' Marriage and Assets

Richard and Daphna were married in January 1991. The couple adopted and raised two young daughters who are now adults. Richard had two children from a prior marriage. Richard and Daphna separated on May 17, 2009, and their marriage was dissolved on September 21, 2010.

At the time of the parties' marriage, Richard, who had started his career as an attorney, was a successful real estate investor, and claimed he had brought $16 million in separate property to the marriage deposited into separate bank accounts. Those accounts remained in Richard's name after the marriage.

Daphna gave up her career as a record producer to raise the couple's young daughters and help promote Richard's business and philanthropic ventures. Daphna's premarriage separate assets consisted of a condominium sold for approximately $200,000 during the marriage; these proceeds were placed in a bank account in Daphna's name only.

The couple bought their marital residence on Rexford Drive in October 1996 for $4.5 million. Richard deeded the property to both of them as community property; the parties do not dispute that it is a community asset.

Exhibit 628, a balance sheet introduced at trial, showed total marital assets of $58,863,543 (consisting of realty, stocks, bonds, cash, other securities and interests).

### II.     Trial, Statement of Decision, Judgment

Trial on property issues commenced on October 15, 2012, and concluded on November 20, 2012.

At trial, as relevant to this appeal, there were four main disputed issues:

1. Whether the Arden Realty profits could be adequately traced back to the $16 million Richard claimed he brought to the marriage using an annualized family expense exhaustion method of indirect tracing;

3

2.  Whether Richard breached his fiduciary duty to Daphna by (a) failing to inform her that real estate investment entities known as the Rexford Funds I through V were about to be taken public and whether the shares in the public company were nonetheless Richard's separate property because they were derived from Rexford Fund V, which Richard created post-separation; and (b) by failing to advise her during the marriage that the investment in Arden Realty was his separate property.

3.  Whether the community should be held accountable for four charitable pledges Richard made that Daphna contended she did not intend to make; and

4.  Whether the trial court abused its discretion in awarding Daphna only $750,000 out of the over $4 million in attorney fees she sought.

In its statement of decision filed July 1, 2013, the trial court awarded Richard the profits from Arden Realty, and awarded Daphna the Rexford Drive house. The court found that while Rexford Funds I through IV were community property, Rexford Fund V was formed postseparation with Richard's separate property, and Rexford Fund V was not merely an extension of the investments of Rexford Funds I through IV such that it was community property; the court awarded that fund to Richard. The court declined to rule on Daphna's claim that Richard breach his fiduciary duty during the marriage by failing to disclose other than to state that Richard "owned no fiduciary duty to invest with community rather than separate property." The court confirmed the disputed charitable contributions as chargeable to the community. Judgment was entered on October 9, 2013. The judgment awarded Daphna $750,000 in attorney fees and ordered her to make an equalizing payment of $9.6 million to Richard.

On October 28, 2013, Daphna moved to reopen trial, contending Richard had concealed his intention to take the Rexford Funds public and had undervalued the funds at trial. The trial court denied the motion.

## DISCUSSION

### I.  Arden Realty Profits Are Separate Property

Daphna's principal argument with regard to the profits of Arden Realty is that the trial court erred in accepting Richard's annualized family expense exhaustion

4

methodology, a form of indirect tracing which Daphna contends is not sanctioned in commingled funds cases. While Daphna's arguments on this issue are not unreasonable, they are not persuasive. We find the disputed methodology was appropriate in this case and that substantial evidence supports the trial court's factual finding that Richard's pre-October 1996 Arden Realty related investments were his separate property.

### A. Factual Background

#### 1. Arden Realty

Richard, a former real estate partner at a prominent law firm, developed Arden Realty into what was said to be the largest commercial office real estate business in Southern California. Richard took Arden Realty public in 1996 in an IPO.

Richard and his business partner Victor Coleman started Arden Realty in 1991, after the date of the parties' marriage. Richard created two entities, a management company named Arden Pacific Management Group (Arden Pacific)[3] and an investment company named Arden Investment Group (Arden Investment). Neither entity actually owned any real estate; the real estate was held by separate entities. Arden Pacific had between 60 and 100 employees and managed the buildings, earning money through management fees. Arden Investment did not have any employees. For tax purposes, Richard formed both companies as subchapter S corporations.[4]

Richard's initial investment of $600 in Arden Pacific and $700 in Arden Investment gave him a 60 percent and 70 percent share, respectively. Richard asserted his capital contributions to Arden Pacific always consisted of separate property, and he intended the businesses to remain separate property. Daphna did not have any shares in either company. Richard was chairman and chief executive officer (CEO) of both

---

[3] Arden Pacific was later renamed "Namiz," which is "Ziman" spelled backwards.

[4] Title 26 United States Code sections 1361(a)(1); 1362.

5

companies, but did not engage in day-to-day management. Richard capitalized Arden Pacific with up to $200,000 in separate property funds until it became self-supporting.[5]

### 2. Acquisition of a Portfolio of Commercial Properties

In 1993, Richard began to amass a commercial property portfolio through separately created entities under the Arden name, and did not hold title in his own name. Each transaction had multiple investors who contributed capital to the newly-formed entities. Daphna did not invest in any of the buildings, nor was she a limited partner in any of the entities used to purchase the buildings. Richard intended that the buildings would be his separate property. Richard invested in a total of 22 commercial properties with what he contends were separate property funds of $2,686,248 during the period 1993 to 1996. Included among those properties was 9911 West Pico. Richard asserted he told Daphna these investments were his separate property.

### 3. Creation of Arden Realty and IPO

In October 1996, the entities holding the commercial properties and Namiz (formerly known as Arden Pacific) were consolidated and merged into a new entity, Arden Realty. Through an initial public offering, the new company raised $435 million. Richard, either directly or through several entities in which he had an interest, received 1,427,851 "founder's shares" or operating units, which were later converted to stock.[6] Richard became chairman and CEO of the new company and over the next ten years, received between $60 to $80 million in income. Richard does not dispute the post-1996 income was community property.

In May 2006, General Electric Capital Corporation (GE) purchased Arden Realty. Upon the purchase, Richard's founders' shares had to be converted to stock. Richard held 582,186 shares and Namiz, Inc. held 465,118 shares. After making some gifts to his children, Richard held 338,393 operating units, which were converted into Trizek

---

[5] It is not clear from the record whether Arden Investment ever received any more than its initial capital contribution.

[6] Arden Investment did not become part of Arden Realty and Richard did not receive founder's shares based on his share of Arden Investment.

Operating Units (the operating entity that GE set up to receive the assets) upon the sale to GE. The conversion ratio was 1.84 Trizek units for every unit of Arden Realty, resulting in a total of 572,534 Trizek units. Richard completed his sale of all Arden Realty shares and Trizek units in 2009. In total, Richard received $16,800,000 from the sale. He purported to trace those proceeds to a 2006 Smith Barney brokerage account worth $30,905,628. At the date of separation, Richard valued the Arden Realty proceeds at $32,752,412.

### 4. Expert Testimony and Exhaustion Tracing at Trial

#### a. Richard's Missing Bank Records

While under Richard's custody and control, the bank statements showing the source of monies invested in Arden Pacific, Arden Investment, and the various entities that held the Arden properties were lost. As a result, he used the handwritten check registers from his accounts to trace his separate property funds. Richard's sister Phyllis Cutler explained that she performed bookkeeping services for Richard in the late 1980's. She paid bills and reconciled bank statements. Cutler was unable to find the bank statements and cancelled checks for the check registers, although she looked in Richard's office and storage space at 9911 West Pico Boulevard. Although she believed the bank records were in storage at 9911 West Pico, Cutler did not know whether the bank records were in storage at 9911 West Pico. She did not know how the check registers got separated from the bank statements, because she usually kept them together. Cutler received a refund for storage paid from the building.

Richard's check registers contained her handwriting and Richard's handwriting. She reconciled the accounts with the bank statement. She would use white-out to correct mistakes; such corrections were done at the time the entries were made. When Cutler was done with the registers and bank statements, she put them in a file cabinet. It was not her practice to throw them away. To her knowledge, the check registers had not been altered in any way.

7

### b.      *Miskei's Analysis*

Miskei, a forensic accounting expert, testified on Richard's behalf to trace Richard's separate property investments.  In his opinion, investments in Arden were made with separate funds because no community funds were available to fund the purchase of the properties that ultimately became Arden Realty.  Miskei summarized his findings in a series of tables and spreadsheets, exhibits 614, 615, 616, and 618.

Miskei did not have sufficient banking documents to perform a direct tracing, so Miskei used the exhaustion analysis method of tracing[7] to show Richard's separate property assets during the first five years of marriage, 1991 to 1996.  In support of his analysis, Miskei started with the settlement documents from Richard's divorce from his first wife Lynn in 1990, and financial statements dated in 1988 and 1989.  In 1989, Richard had assets in excess of $16 million.  Miskei also reviewed tax returns from 1985 through 1988 and 1990.  Miskei looked at the check registers for seven bank accounts during various time frames.  However, Miskei was not able to determine precisely how much money Richard had on hand in bank accounts at the time of his marriage to Daphna due to the lack of records.

Miskei asserted that during this period, Richard did not receive any salary from any source.  The community received net income ranging from approximately $28,640 to $153,000 in any given year, and the community ran a yearly deficit of approximately $262,800 to $571, 200.  Richard, however, did receive dividends, interest and distributions of approximately $350,000 to $500,000 annually for a total of approximately $3.3 million.  In summary, exhibit 614 established that the community ran at a deficit for these six years of $2,363,847.

Miskei's exhaustion analysis found $3,355,179 in separate property derived from assets Richard had acquired before marriage.  Those funds included the monies totaling

---

[7] A method of tracing separate property interests that is accomplished where a spouse shows the exhaustion of available community funds at the time of acquisition of the disputed asset.  (*In re Marriage of Stoll* (1998) 63 Cal.App.4th 837, 841.)

$2,686,248 used to purchase the property portfolio that later was acquired by Arden Realty.

Daphna presented no evidence on the exhaustion tracing or the founder's shares. She did not attempt to use the *Pereira/Van Camp*[8] method to apportion assets between separate contributions and gain in value due to community efforts.

### 5.	Statement of Decision on This Issue

At trial, Daphna objected to the use of Miskei's exhaustion analysis as lacking in foundation because Miskei's figures constituted hypothetical assumptions with no support, and observed that the burden was not on her to impeach the evidence. Daphna's counsel further argued, "If you use an exhaustion [theory], they have to establish that the money existed on the day of an acquisition and that that money was actually used for the acquisition." Daphna contended that by permitting Richard to rely on Miskei's family expense exhaustion methodology, the court put impermissibly the burden on her to establish the funds used to capitalize Arden was community property.

In its statement of decision, the court found that Richard could use the Miskei's exhaustion analysis because "courts have approved the family expense exhaustion methodology when presented on a monthly, annual, or other representative time period basis," citing *Hicks v. Hicks* (1962) 211 Cal.App.2d 144, 159–162 (*Hicks*) and *Kenney v. Kenney* (1954) 128 Cal.App.2d 128, 136 (*Kenney*).

---

[8] Under *Pereira v. Pereira* (1909) 156 Cal. 1, a fair return on the separate property investment is allocated to separate property as derived from the separate property capital, and the balance of the increased value is allocated to community property as arising from community efforts. (*Id.* at p. 7; *Beam v. Bank of America* (1971) 6 Cal.3d 12, 18 (*Beam*).) The alternative *Van Camp* approach determines the reasonable value of the community's services, allocates that amount to community property and allocates the balance to separate property. (*Van Camp v. Van Camp* (1921) 53 Cal.App. 17, 26–28; *Beam*, at p. 18.)

## B. Discussion

### 1. The Trial Court Correctly Ruled That An Annualized Family Expense Exhaustion Methodology Can Be Used to Rebut the Community Property Presumption in Section 760

Daphna contends a spouse using indirect tracing to establish the separate property character of assets acquired during marriage can only meet the burden to show that community expenses exceeded community income with bank records specific to the actual day of acquisition of each asset acquired. Without daily bank records, she argues, indirect tracing is categorically prohibited as a method of proof. Daphna purports to derive this requirement from *See v. See* (1966) 64 Cal.2d 778 (*See*). In *See*, the husband in a dissolution proceeding argued that essentially all assets acquired during a 21-year marriage were his separate property based on an analysis showing aggregate community expenses exceeded aggregate community income over the life of the marriage. The husband made no attempt to show "an excess of community expenses over community income at the times the other assets purchased during the marriage were acquired." (*Id.* at p. 786.) The court rejected the husband's marriage-long, total recapitulation analysis, explaining that "the time of acquisition of disputed property is decisive" (*id.* at p. 784) and that a spouse who comingles community and separate funds "assumes the burden of keeping records adequate to establish the balance of community income and expenditures at the time an asset is acquired with comingled property." (*Ibid.*) The *See* court did not suggest, either explicitly or impliedly, however, that only bank statements showing the daily balance of community funds would be deemed "adequate" to prove community funds were exhausted at the time of asset acquisitions.

Indeed, the *See*, *supra*, 64 Cal.2d 778 court left undisturbed prior court cases inconsistent with Daphna's contention that only daily records of bank balances could support a finding that community funds were exhausted when assets were acquired. In *Kenney*, *supra*, 128 Cal.App.2d at p. 136, the appellate court affirmed an award of separate property to the husband based on a family expense exhaustion analysis showing that for each *year* of marriage, family expenses exceeded community income. The *See*

10

court discussed *Kenney*, disapproving of the decision on unrelated grounds, but did nothing to call into question its finding that an annualized expense analysis was adequate to establish the separate property character of assets acquired with commingled community and separate property funds. Similarly, in *Hicks*, *supra*, 211 Cal.App.2d at pages 159–162, the appellate court approved an exhaustion analysis for each year of a 10-year marriage based on one sample month of each year. Neither the *Kenney* analysis nor the *Hicks* analysis would comport with the rule Daphna now proposes: that family expense exhaustion analysis requires proof based on bank records pinpointed to the date of acquisition of each asset.

Subsequent to *See*, *supra*, 64 Cal.2d 778, in *Beam*, *supra*, 6 Cal.3d 12, the court expressly discussed the meaning of *See* and clarified that evidence of the balance of the community estate could be determined on a monthly or yearly basis for the purpose of rebutting the presumption that property acquired during marriage was community. In *Beam*, the record evidence indicated that throughout the course of a 29-year marriage, "the family's *normal* living expenses were $2,000 per month, or $24,000 per year." (*Beam*, at p. 21.) After determining that annual community income was approximately $17,000 per year, and comparing that income to the community expenses, the trial court found no net community property could be established "*over the course of the entire marriage*." (*Id*. at p. 21, fn. 6.) Using this total recapitulation analysis, the trial court determined that all property acquired during marriage (but for one specifically identified promissory note) was the husband's separate property. On review, the Supreme Court made clear that *See* might call into question the "'total recapitulation' approach" used by the trial court; however, the court found that, putting aside the marriage-long approach used by the trial court, the record evidence of annual (or monthly) expenses and income was sufficient for the husband to have met his burden to show exhaustion of community property funds at the times of acquisition. Significantly, the court referred to use of yearly or monthly analyses as "accounting procedures *prescribed* by *See*," explaining: "if the balance of the community estate were determined on a yearly, or indeed monthly, basis, rather than over the entire marriage, there was never a positive balance in the estate

11

since community living expenses regularly exceeded the community earnings . . . . Thus, on this record, the application of *See*'s accounting procedure would not alter the trial court's conclusion." (*Beam*, at p. 21, fn. 6., italics added.)

In addition to her contention that only a daily analysis of records could suffice to show indirect tracing, Daphna appears to seek a rule that precludes consideration of any evidence other than bank records in determining whether community expenses exceeded community income when investments were made. There is no basis for imposing such an evidentiary straightjacket on the parties and the courts. Indirect tracing, like direct tracing, is simply a method of proof. As our Supreme Court has explained, "post-marital property can be established to be separate property by two independent methods of tracing. The first method involves direct tracing. . . . The second method involves consideration of family expenses." (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 612 (*Mix*).) Both methods are available to a spouse who, having commingled community property funds and separate property funds during marriage, seeks to overcome the presumption that assets acquired from comingled accounts are community assets. (*Ibid*.)

In *Mix*, *supra*, 14 Cal.3d 604, a direct tracing case, the court found that the high-earner wife, who "had the management and control of the commingled bank accounts" used to acquire certain property during marriage, overcame the presumption that the acquired property was community. (*Id*. at p. 611.) To support her contention that assets were acquired with separate property funds, the wife introduced a "schedule compiled by herself and her accountant from her records" but not tied to any bank records, "demonstrat[ing] that [her] expenditures for separate property purposes closely paralleled in time and amount separate property receipts." (*Id*. at p. 613.) The court noted that this schedule "by itself [was] wholly inadequate. . . to support the trial court's finding that [she] 'identified and traced' the separate property," because of the unavailability of the wife's bank or other records to correlate entries on the schedule to entries in any particular bank account. Nevertheless, the court held the wife met her burden because she also "personally testified that the schedule was a true and accurate record" and that "it accurately corroborated her intention throughout her marriage to these expenditures

12

for separate property purposes." (*Id*. at p. 614.) The court stated, "[t]he trial court evidently believed [the wife]" and found there was substantial evidence to support the finding that the wife had traced her separate property. (*Ibid*.) "We are satisfied that the trial court was warranted in inferring from this evidence that the bank records if introduced would fully verify the schedule as supported by [the wife's] testimony." (*Ibid.*)

Daphna concedes, as she must, that there is no reason that the law should impose much more stringent evidentiary requirements on a spouse using indirect tracing than a spouse using direct tracing to overcome the community property presumption. Indeed, both methods of proof are subject to the same standard: "A spouse's claim that property acquired during a marriage is separate property must be proven by a preponderance of the evidence." (*In re Marriage of Valli* (2014) 58 Cal.4th 1396, 1400.) Moreover, nothing in *See*, *supra*, 64 Cal.2d 778 suggests that a trial court's factual determination as to whether particular records are "adequate" to prove "the balance of community income and expenditures at the time an asset is acquired" should be made on the face of those records alone, without reference to all other evidence in a case, including the testimony of witnesses or the parties. Just as in the context of a direct tracing as discussed in *Mix*, *supra*, 14 Cal.3d 604, whether a spouse using indirect tracing has met the burden of producing adequate records to prove the separate property character of disputed assets must be assessed in light of all the evidence. (See *Estate of Murphy* (1976) 15 Cal.3d 907, 919.)

**2.      Substantial Evidence Supports the Trial Court's Finding that Arden Realty is Richard's Separate Property**

At trial, Richard introduced an indirect tracing analysis to rebut the presumption in section 760 that the various assets acquired that ultimately became Arden Realty were acquired with his separate property funds, and not community property funds. As noted, Richard's forensic accounting expert Miskei calculated the amount of separate property Richard brought to the marriage in January 1991 (approximately $16 million); the annual dividends and distributions from that separate property during the first five years and 10

13

months after marriage when the assets in dispute were acquired (approximately $3.3 million); the annual community income during that same period (approximately $49 thousand to $153 thousand per year); and the annual community expenses for the period (approximately $335 thousand to well over $600 thousand per year). To determine separate and community property income, Miskei reviewed and analyzed a complete set of tax returns for the entire period of the marriage, including, from 1990 through 2011, the Zimans' personal tax returns, and the tax returns for each entity in which Richard or they had any interest. To determine community expenses, Miskei reviewed, and analyzed the check registers that had been contemporaneously maintained by Richard's sister, who acted as their bookkeeper.

Miskei calculated, based on these and other records, that the community expenses outstripped community income between 1991 and 1996, from a low of $262 thousand per year to a high of $571 thousand per year. Miskei opined, based upon these substantial annual deficits in community and based upon the significant separate property funds of Richard, that the investments in entities that became Arden Realty were Richard's separate property investments.

In addition to offering the testimony and reports of the forensic accounting expert, and the documentary evidence underlying the reports and testimony, Richard testified at trial on these same issues. Richard specifically addressed that, during the period from the date of marriage through the creation of Arden Realty, there were no community funds available for use in investing, because community expenses overwhelmingly depleted any minimal community income. More specifically, Richard testified about the acquisition of the various assets that ultimately became Arden Realty, explaining that there was an absence of community funds at the time of each investment and how the investments were made with separate property funds. Further, Richard explained that it was his intent to use only his separate property funds, given the lack of community resources, and that he discussed this with Daphna at the time.

Evaluating the tracing analysis itself, and in the context of the other evidence introduced, the trial court "overarchingly adopted the Miskei tracing . . . analysis," and

14

found that "given the expenditures of the family, when compared to the community income, there is no conclusion that can be reached other than [Richard's] separate property was used to acquire the various assets."

Daphna contends the trial court erred in adopting and relying on Miskei's analysis, raising a series of factual disputes about the weight and meaning of the underlying evidence of income and expenses, and questioning Miskei's reasoning. As an initial matter, Daphna claims that the Miskei analysis cannot be supported because it is based on the handwritten check registers and not bank statements. To the extent she argues that only bank statements qualify as records adequate to support a tracing analysis, and all other records must be categorically excluded, the argument has no merit, as explained above in the discussion of *Mix*, *supra*, 14 Cal.3d 604. To the extent Daphna intends to question the evidentiary weight that should be given to the particular check registers at issue in this case, she fails to present any argument that could call into question the trial court's factual finding that the check registers admitted at trial "were accurate and correctly reflect the banking activity during the appropriate time period." The trial court heard extensive testimony from Phyllis Cutler about how the check registers were created from the bank records, how they were maintained, about their authenticity and integrity, and about their meaning. "[T]he trial court was warranted in inferring from this evidence that the bank records if introduced would fully verify" the check registers. (*Id.* at p. 614.)

Daphna further claims that Miskei employed reasoning that either understated community income, or overstated community expenses. But these claims merely rehash factual disputes that were raised at trial, or for the first time in post-trial motions, and there is substantial evidence to uphold the trial court's finding that Miskei analysis was "persuasive" and "supported in both the law and . . . facts of this case." Daphna contends that Miskei engaged in circular reasoning by excluding distributions from various Arden entities from his calculation of community property funds, instead assuming the Arden entities were Richard's separate property. However, Miskei explained that this was not a mere assumption, but a consequence of the year-by-year determination that the community did not have the funds to invest in these entities when created. Daphna

15

complains that Miskei did not include certain pass-through income from the various S corporations and partnerships owned by Richard; however, Miskei provided testimony and analysis to show that these facts would not have changed the result of the family expense exhaustion methodology because pass-through income did not reflect actual cash flow received by Richard and was, in any event, exceeded by pass-through losses. Finally, Miskei testified regarding how his analysis of tax returns refuted Daphna's contention that community funds should have been increased as a result of certain claimed property management fees.

"The presumption that all property acquired by either spouse during the marriage is community property may be overcome. [Citations.] Whether or not the presumption is overcome is a question of fact for the trial court. [Citations.]" (*Mix*, *supra*, 14 Cal.3d at pp. 611–612.) "Commingling of separate and community property does not alter the status of the separate property interest so long as it can be traced to its separate property source. [Citation.] Whether the spouse claiming a separate property interest has adequately met his or her burden of tracing to a separate property source is a question of fact and the trial court's holding on the matter must be upheld if supported by substantial evidence. [Citations.]" (*In re Marriage of Cochran* (2001) 87 Cal.App.4th 1050, 1057–1058.)

Here, there is substantial (and uncontroverted[9]) record evidence that supports the trial court's finding that Richard rebutted the presumption in section 760 and established

---

[9] The community property presumption is a "rebuttable presumption affecting the burden of proof." (*In re Marriage of Haines* (1995) 33 Cal.App.4th 277, 290.) The effect of this presumption was to impose upon Richard, the party against whom the presumption operates, "the burden of proof as to the nonexistence of the presumed fact." (Evid. Code, § 606.) Daphna, because she was the party who has the benefit of the presumption, was entitled to sit back and rely on the presumption alone and force Richard to prove his case. However, Daphna also could have elected to present her own evidence reinforcing the presumption. (*Haycock v. Hughes Aircraft Co.* (1994) 22 Cal.App.4th 1473, 1495.) In other words, although the presumption did "*not* disappear" when Richard presented his evidence (*ibid.*) Daphna had the option of presenting her own evidence to help convince the trial court that Richard had failed to meet his burden. Daphna elected

that the investments that led to Arden Realty were made with his separate property funds, as community resources were exhausted. As a result, the trial court's finding that Richard had traced the Arden Realty profits to his separate property investment is affirmed. We have reviewed Daphna's other contentions arguing that some of the assets that became Arden Realty were community property and deem them to be without merit.

## II.    Breaches of Fiduciary Duty and Motions to Reopen Trial

### A.    *The Motion to Reopen Trial Regarding the Rexford Funds IPO*

Daphna claims that there were material changes in the value of certain assets—known as the Rexford Funds—based on an IPO by a new entity encompassing the various funds that was undertaken after trial. She contends that the trial court erred in denying her post trial motions to reopen trial with respect to these funds and with respect to whether Richard breached his fiduciary duty to her relating to the IPO. We disagree.

### 1.    *Formation of Rexford Funds*

Between 2001 and 2008, Richard created four funds known as Rexford Industrial Fund I, II, III and IV. Funds I through IV were found to be community property, while Fund V was found to be Richard's separate property. Funds I through IV were not REIT's.[10] Rexford Industrial Fund I, formed in 2001, was composed of industrial real estate purchased throughout Southern California with $15 million Richard raised from 28 limited partners. Richard had an indirect interest in the Rexford Funds I through IV through an entity known as "Upstream Partners II." The parties agree Upstream is community property. Rexford Funds II, III, and IV suffered from financial reversals during the financial downturn and carried large debt loads, and the partners in the funds did not get along. In 2008, the funds were restructured, and the right to create any new funds reverted to Howard Schwimmer, who was the managing general partner of Rexford.

---

not to present any conflicting evidence. Instead, she gambled that Richard would not be able to marshal the evidence necessary to rebut the community property presumption.

[10] REIT is shorthand for "real estate investment trust."

17

Sometime in 2010, Schwimmer approached Richard about forming another fund. In late 2010 or early 2011, they formed Rexford Fund V, which was a REIT. The fund was a "dramatically different type of entity" from Rexford Funds I through IV. Richard has an interest in the general partner entity of the fund, as well as a limited partner interest. He has contributed $760,000 to the fund. Richard asserted his investment funds for Rexford Fund V came from Richard's separate property, namely a post-separation bank line of credit. The remainder of the $100 million invested in the fund came from very high net worth individuals. Daphna declined Richard's offers to invest in Fund V, and did not invest in it. The fund remained open to investors at the time of trial.

### 2. Trial

During trial, Richard's expert Ben Tunnell testified that Richard's interests in Rexford Funds I through IV was $2,450,000, and his interest in Rexford Fund V was $1,500,000. He valued the assets of Funds I through IV at $108 million. At trial, Daphna did not offer any testimony on the value of the Rexford Funds.

Daphna did not want the Rexford Funds divided in kind, and asked that the funds be awarded to Richard with an equalizing payment to her because she believed Richard would make a capital call and deplete her assets. Daphna argued that Richard had breached his fiduciary duty by failing to disclose his intent that the Arden Realty assets remain his separate property and failing to disclose his plans to take Rexford Fund V public. During trial, Daphna requested the court to reserve jurisdiction over the Rexford Fund IPO issue in the event that Richard decided to take the Rexford Funds public. The court declined to do so.

In its tentative statement of decision issued on December 6, 2012, shortly after trial, the trial court stated its intention to award Rexford Fund V to Richard as his sole and separate property, because the evidence established it was formed after the marriage had ended and was not an extension of Rexford Funds I through IV. The trial court awarded Rexford Funds I through IV, which were conceded to be community property, to Richard. The trial court did so for several reasons: Richard had and "continues to provide personal services to each of these entities"; Daphna was "not involved in the

18

running of these business"; and the parties were not communicating. Under such circumstances, the trial court found that continued co-ownership would place "the parties in a virtually untenable position on a going forward basis." The trial court also noted that other general partners of the funds would not accept Daphna as a general partner. The trial court awarded Rexford Funds I through IV to Richard at the $2.45 million value testified to by Richard's expert, finding that the expert's "valuation to be appropriate and credible" and noting that Daphna "did not provide any counter evidence as to value."

### 3.     *The IPO and Daphna's Motions to Reopen Trial*

Three months after the conclusion of trial, on or about February 22, 2013, Richard informed Daphna's counsel, along with all the other investors in Rexford Funds I through IV, and investors in Rexford Fund V, that permission was being sought to pursue an IPO.

On March 4, 2013, Daphna filed a motion to reopen trial and discovery, arguing that the intention to move forward with the IPO constituted newly discovered evidence that should cause the court to revisit the characterization of Rexford Fund V and the value of the Rexford Funds. Richard opposed the motion, arguing that events transpiring after the close of a trial are not "newly discovered evidence," but offering that if Daphna wanted an "in-kind" division of the Rexford Funds I through IV to avoid issues of how the not yet completed IPO might affect their value, he did not object. After a hearing, at which Daphna initially opposed any in-kind division of shares but ultimately stated she would accept an in-kind division if her motion were denied, the trial court denied the motion.

On July 1, 2013, the trial court issued its statement of decision awarding Rexford Fund V to Richard as his separate property and awarding Rexford Funds I through IV to Richard, valued at $2.45 million.

Eight months after the conclusion of trial and just two weeks after the statement of decision, on July 15, 2013, "Rexford Industrial Realty" issued a form S-11 prospectus stating that it was conducting an initial public offering for 16,000,000 shares of stock, at a price of between $13 to $15 per share. The prospectus stated that Richard and his "affiliates" would receive approximately 265,936 shares of common stock and 643,000

common units, with an aggregate value of $13.3 million. The funds were valued at approximately $353 million.

A Securities and Exchange Commission form 8-K dated October 28, 2013 reported that "Rexford Industrial Realty" was seeking the unregistered sale of securities, and that Richard, Frankel, and Schwimmer were cancelling up to 86 percent of their restricted shares in Rexford Industrial Realty based on the concerns of other investors in Funds I through V about the total value of consideration received by Richard, Schwimmer, and Frankel. This "reallocation" would involve $21.1 million of operating partnership units (OP Units) and would be conducted pursuant to a "Transfer Agreement." The transfer agreement permitted those investors in Funds I through V who "transferred property interests to Rexford [Industrial Realty] in the formation transactions" creating Rexford Industrial Realty to exchange their shares in the Rexford Funds for Rexford Industrial Realty shares. Richard's shares were cancelled, and in exchange for his cancelled shares, Richard received a reissue of 455,704 shares. Richard ultimately received shares worth approximately $2.49 million for his interests in Rexford Funds I through IV.

On October 28, 2013, Daphna moved to reopen trial, arguing that Richard had asserted a lower value for the Rexford entities at trial than the valuation asserted in the IPO documents. She also claimed that fund V was an extension of funds I through IV and thus community property. Daphna requested the court to reopen the trial, permit her to conduct discovery, and divide the Rexford Industrial Realty shares in kind. She asserted Richard had breached his ongoing fiduciary duty by materially misrepresenting the value of the asset.

Richard responded that due to the hardships suffered by Funds I through IV, he and his business associates began discussing ways to raise capital and repay the debt of those funds when the real estate markets began to improve in 2012. By early February 2013, they had made the decision to pursue the IPO, and informed all of the investors in the funds of the decision. All documents relating to the IPO were provided to Daphna's counsel. Richard further argued that, based upon the reallocation of OP Units to

20

accommodate the concerns of the other investors in the Rexford Funds, he would now own 358,177 shares/operating units valued at $2,492,877 based upon the monies from Funds I through IV, and $1,842.544 based upon his interest in Fund V, which he asserted was his separate property. Richard had cancelled 86 percent of his restricted stock grants. Richard introduced evidence that his interest in Rexford Funds I through IV were now valued at $2.49 million.

The trial court stated that Daphna did not get "a second bite at the apple" although the IPO did not come out during the trial. The court denied Daphna's motion.

### 4. *Discussion*

A trial court has broad discretion to determine whether it should reopen a matter to evaluate a substantial change in the value of the community property to be divided at dissolution. (*In re Marriage of Olson* (1980) 27 Cal.3d 414, 422.) *Olson* held that a trial court abused its discretion by denying a motion to reopen, after trial but before entry of judgment, where the court's tentative decision found there to be significant equity value in the family residence, but a post-trial foreclosure sale of that residence resulted in no equity being available to the community.

Here, Daphna contends the trial court erred in denying her motions to reopen discovery because of an alleged change in value of the Rexford Funds. In support of the change in value, Daphna offered a prospectus for the initial public offering of Rexford Industrial Realty, Inc., a corporation newly formed (several months after trial) that included the various assets of Rexford Funds I through IV, and Rexford Fund V. According to Daphna, the value for the collective funds anticipated in the prospectus was three times higher than the value claimed by Richard's expert at trial. Based on the anticipated share distributions, she also claimed Richard would receive approximately $10 million more from the IPO than estimated at trial.

The trial court did not abuse its discretion in denying Daphna's motions. As an initial matter, Daphna's focus on the overall value of the IPO as set forth in the prospectus is misplaced: the IPO entity included the assets of Rexford Fund V, a separate property entity belonging to Richard, as well as the community property entities Rexford

21

Funds I through IV.  The relevant inquiry under *In re Marriage of Olson*, *supra*, 27 Cal.3d 414 is whether the value of the community property has changed.  To merit a reopening of trial, Daphna's burden was to show a change in the value of the community interest in Rexford Fund I through IV.  "[A] family court can prevent discovery which is directed solely towards assets. . . which have already been adjudicated or are clearly the separate property . . . of one of the parties."  (*In re Marriage of Hixson* (2003) 111 Cal.App.4th 1116, 1123.)

With respect to the value the community property interest in those funds, the trial court was well within its discretion to deny the motion to reopen.  First, at the time the trial court denied the initial motion to reopen and at the time of the filing of the statement of decision, no IPO had taken place and, as found by the trial court, "[Daphna] presented no evidence in her motion that the prospect of the public offering affected in any way [the] previous valuation of the community interest in Rexford Funds I-IV."  Daphna has made no showing on appeal that undermines the trial court's ruling in this regard.  Second, and more significantly, the evidence produced of the community interest in Rexford Funds I through IV as a result of the IPO is that the shares were worth approximately $2.49 million, fully in line with the value estimated at trial and adopted in the court's statement of decision.  The trial court did not abuse its discretion in determining that Daphna failed to make a case that the community interest in the Rexford Funds changed so substantially post-trial that trial should be reopened.[11]

B.      *The Alleged Breach of Fiduciary Duty Relating to the Arden Realty Investments*

Daphna contends that the trial court erred in refusing to rule on her claims—made before, during and after trial—that Richard breached his fiduciary duty by (1) failing to disclose and to take advantage of investment opportunities available to the community,

---

[11] Daphna concedes that she has no evidence that the IPO was being planned at the time of trial, and we reject her claim that the trial court abused its discretion not to reopen the trial to determine whether Richard breached his fiduciary duty by not disclosing the IPO during trial.

and (2) failing to disclose his intention to keep the Arden Realty assets as his separate property during marriage.

With respect to investment opportunities in the assets that became Arden Realty, the trial court expressly ruled against Daphna's claim of breach on two related grounds: that Richard "owed no fiduciary duty to invest with community rather than separate property funds" and that "the evidence showed . . . that any existing community funds were exhausted by family living expenses." As we have discussed, substantial record evidence supports the trial court's determination that the community funds were greatly exhausted during the period the assets were acquired. This same evidence defeats Daphna's theory that Richard breached his fiduciary duty by seizing for himself investment opportunities that Daphna claims Richard should have made instead for the community.

Although Daphna cites to dicta in *In re Marriage of Duffy* (2001) 91 Cal.App.4th 923 that "[a] breach of loyalty could occur simply from seizing an excellent investment opportunity for the benefit of one's personal property rather than for the benefit of the community estate," such a situation could only present itself where the community had the resources to invest. Here, the facts as found by the trial court and supported by substantial evidence do not support that Richard's separate funds and the community were in competition for investment opportunities; as such, he did not "secure any advantage, in opposition to the other party" that would implicate a breach of the duty of loyalty. (*Id*. at p. 937.)

Daphna cites no authority, and we are not aware of any, that would impose on Richard a duty to have used even more of his separate property funds to pay the large deficits created by the community's living expenses in order to make available community funds to invest. Indeed, imposing such an obligation would be contrary to the "long line of California decisions [that] ha[ve] established that "it is presumed that the expenses of the family are paid from community rather than separate funds [citations] [and] thus, in the absence of any evidence showing a different practice, the community earnings are chargeable with these expenses."" (*Beam*, *supra*, 6 Cal.3d at p. 20.) In any

23

event, there is no reason that Richard had to keep his separate funds idle. "A married person may, without the consent of the person's spouse, convey the person's separate property." (§ 770, subd. (b).) Under these facts, Richard cannot be found to have breached his fiduciary duty by deciding to invest his separate property in the assets and entities that became Arden Realty. "The fact that husband purchased the . . . property with his separate funds, as the trial court found, is not evidence of taking any undue advantage nor is it a breach of a fiduciary relationship which would invoke a presumption of fraud or undue influence." (*Somps v. Somps* (1967) 250 Cal.App.2d 328, 338.)

With respect to Daphna's second theory, that the trial court failed to address in its statement of decision her claim that, assuming the various assets were determined to be Richard's separate property, Richard nevertheless breached his fiduciary duty to her by misleading her to believe that some of the entities and assets were community assets, we agree that the statement of decision is deficient. Section 721, in pertinent part, provides: "[I]n transactions between themselves, spouses are subject to the general rules governing fiduciary relationships that control the actions of persons occupying confidential relations with each other. This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other. This confidential relationship is a fiduciary relationship subject to the same rights and duties of nonmarital business partners, as provided in Sections 16403, 16404, and 16503 of the Corporations Code . . . ." (§ 721, subd. (b).) Section 1100, which further delineates the scope of a managing spouse's duties, provides that the duty "includes the obligation to make full disclosure to the other spouse of all material facts and information regarding the existence, characterization, and valuation of all assets in which the community has or may have an interest . . . ." (§ 1100, subd. (e).)

The evidence regarding whether Richard breached a fiduciary duty to Daphna by misrepresenting the character of the entities and assets in which he was investing is conflicting. On the one hand, Daphna argues that Richard never advised her that Arden was "his" and affirmatively led her to believe in 1991 that Arden was a community asset by putting her name on various shareholder documents and by telling her that "we were

24

starting a new company." Daphna points to one of the documents, a "Shareholder Agreement to Elect S Corporation Tax Status" for Arden Investment, and argues she was misled because it expressly "confirms that any issued and outstanding shares of the Corporation's stock owned by a married signatory . . . are community property." On the other hand, Richard testified at trial that he explicitly told Daphna the investments leading to Arden Realty were his separate businesses and that Daphna acknowledged being so informed. He also testified that to "placate her" about the fact that these were his separate property investments, he wrote her several checks, for a total of $200,000 to $300,000, that she deposited into her separate property account.

Breaches of fiduciary duty almost always occur in the context of one spouse compromising the community property interests of the other spouse. That is because "[t]he key factor in the existence of a fiduciary relationship lies in control by a person over the property of another." (*Vai v. Bank of America* (1961) 56 Cal.2d 329, 338.) Nevertheless, given that section 721 imposes "the duty of 'highest good faith and fair dealing,'" a spouse may also breach his or her fiduciary duty by taking unfair advantage of the other in dealings involving separate property. (*In re Marriage of Walker* (2006) 138 Cal.App.4th 1408, 1419.) Here, Daphna raised with the trial court the claim that, should the court find that the investments Richard made were his separate property, Richard nevertheless breached his duty by misleadingly telling Daphna this was a community business. Daphna is entitled to a ruling from the trial court on this issue.

Accordingly, we remand to the trial court, for the purpose of making findings and rulings, the following issues: (1) whether Richard breached a fiduciary duty by misleading Daphna as to the separate property character of any of his separate property investments in entities that became Arden Realty; and (2) if a breach occurred, whether any remedy should be imposed, and if so what remedy. Nothing in this remand order should be read to suggest that Daphna can challenge the separate property character of the assets that became Arden Realty; as we have discussed above, the trial court's ruling that Arden Realty is Richard's separate property is affirmed.

25

## III.    Due-on-Death Charitable Pledges

Daphna contends she is not obligated by the four due-on-death charitable pledges Richard made to the Jewish Home for the Aging, the City of Hope, American Friends of Hebrew University, and the Jewish Federation Centennial Fund because she did not sign the pledges as required by both the Family Code and the Probate Code. Richard contends Daphna forfeited the issue by failing to raise it at trial; the pledges were irrevocable when made; Probate Code section 5021 has no application here; and substantial evidence supports the finding Daphna consented to the pledges. We find that substantial evidence does not support the finding that Daphna consented to the pledges.

### A.    *Factual Background*

During their marriage, the parties engaged in substantial philanthropic activities and made numerous large donations. At trial, Richard attempted to hold the community liable for four pledges totaling $3.25 million. Daphna argued that Richard did not obtain her consent and Richard controlled the finances, asserting that she did not sign the pledges. Daphna disputed her consent to four specific pledges: (1) a due on death pledge to the Jewish Home for the Aging of $1.25 million; (2) a $500,000 pledge to the City Hope; (3) a $500,000 pledge to the American Friends of Hebrew University, and (4) a $1 million pledge to the Jewish Federation Centennial Fund. Daphna did not sign the pledge to the Jewish Home for the Aging dated July 18, 2001; she did not sign the pledge to the City of Hope dated March 6, 1998; and she did not sign the pledge to the American Friends of Hebrew University dated in 1997. Furthermore, none of these pledges mentions Daphna by name. These pledges are in Richard's name only, signed by him only and do not mention Daphna.

Three of the pledges were earmarked for building construction with the buildings carrying the Zimans' names. Richard argued that at no time prior to trial did Daphna contest these pledges, and she attended groundbreaking ceremonies, was photographed as a large donor at such events, and gave speeches. Richard would not have made the pledges without talking to Daphna first. Daphna was emphatically in favor of the pledges, and never gave Richard any idea that she opposed them.

26

Daphna, however, asserted that some of the pledges were made without her knowledge or consent. Daphna has never told anyone at the City of Hope that she did not consent to the pledge, because she did not want to embarrass Richard. She did not ask that her name be taken off any of the buildings. Daphna never told Richard's sister Phyllis Cutler that she did not approve of the charitable donations.

The trial court, pursuant to section 1100, subdivision (b), ordered that the community bear in its entirety all of the pledges. The trial court based its decision on the "fact that the parties spent a great deal of time and effort during the marriage on charitable endeavors." In reaching its decision, the court, in principal part, relied on a declaration by Daphna, which was not in evidence, wherein she detailed the family's devotion to charity.

### B. Discussion

Section 1100, subdivision (b) provides in relevant part, "A spouse may not make a gift of community personal property, or dispose of community personal property for less than fair and reasonable value, without *the written consent* of the other spouse. This subdivision does not apply to gifts mutually given by both spouses to third parties." (Italics added.) The gift may be voided to the extent of the nonconsenting spouse's one-half community property interest. (*Harris v. Harris* (1962) 57 Cal.2d 367, 369.)[12]

---

[12] On appeal, Daphna also contends that "the due-on-death pledges are subject to the Probate Code as well as the Family Code." The Probate Code argument was apparently offered because the trial court, in its tentative statement of decision, decided sua sponte that the pledged amounts would be "deposited from the currently available community accounts into a non-revocable trust" until Richard's death and then distributed to the charities. In response to the tentative statement of decision, Daphna objected to the trial court's decision to not only make the community responsible for the disputed pledges, but also impose an irrevocable trust on her. (In the final version of its statement of decision, the trial court deleted the trust language and, instead, ordered the parties "to solely assume and pay and indemnify and hold the other party harmless from his/her one-half of all such liability on such pledges.") Daphna argued that under Probate Code section 5021, her written consent to the pledges was required, citing to *In re Estate of Miramontes-Najera* (2004) 118 Cal.App.4th 750. In that case the Court of Appeal held that a court must grant a surviving spouse's petition to set aside a transfer of community property made without consent. (*Id*. at p. 759.) On appeal, Daphna reprises

27

Factual determinations made by the trier of fact are reviewed on appeal for substantial evidence. (*Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 510.) Under this standard, we must "resolve all explicit conflicts in the evidence in favor of the respondent and presume in favor of the judgment all *reasonable* inferences." (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1623–1633, fn. omitted, italics added.) In addition, we must determine whether the evidence is substantial. Substantial evidence "'must be of ponderable legal significance.'" (*Id.* at p. 1633.) "'Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable . . . , credible, and of solid value . . . .'" (*Ibid.*) "While substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on evidence' [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding [citations]." (*Ibid.*; see *Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1204 [inference . . . cannot be based upon suspicion, imagination, speculation, surmise, conjecture or guesswork"].)

Here, the evidence is undisputed that Daphna did *not* sign three of the pledges (the pledge to the Jewish Home for the Aging; the pledge to the City of Hope; and the pledge to the American Friends of Hebrew University). The principal evidence upon which the trial court relied in making the community liable for all four pledges—Daphna's declaration—is not of "solid value." The portion of Daphna's declaration quoted by the trial court in its Statement of Decision does mention the specific charities at issue and it states that Daphna and Richard pledged millions and hosted events for those charities among others. However, the declaration does not state that Daphna participated in or

her objection to the tentative Statement of Decision, including her reliance of *Miramontes-Najera*. We find Daphna's reliance misplaced. Daphna is not a surviving spouse and, more importantly, she has not filed a petition under section 5021 for an order setting aside the pledges. Section 5021's application is limited to "a proceeding to set aside a nonprobate transfer of community property." (Prob. Code, § 5021, subd. (a).) As a result, we confine our analysis to whether the trial court's decision was proper under the Family Code.

consented to the specific pledges at issue. Moreover, that very same excerpt from Daphna's declaration also states that "Richard, on his own, and against [Daphna's] wishes has pledged $2,100,000 to various UCLA entities."

On this record, we believe that the inferences that the trial court drew were so speculative that they fail the "reasonable" requirement. The evidence upon which the trial court relied to reach its conclusion that the specific pledges at issue were "mutually given" was equivocal on the general issue of charitable giving and consent, and completely silent with regard to the specific pledges at issue. Generalized evidence of Daphna's intent to participate in many of the family's charitable contributions is simply too attenuated to support the finding that these not inconsequential pledges (the total amount at issue is $3.25 million) were "mutually made by both spouses." Because the trial court's decision in this regard is based on speculation and conjecture, we reverse the trial court's decision and hold that Richard alone is obliged to honor the pledges that he alone signed. We remand for further proceedings consistent with this holding.

## IV.   Attorney Fees

Daphna challenges the trial court's order awarding her attorney fees of $750,000 instead of the requested $4 million, contending the award operated as a sanction for (1) unreasonable arguments, (2) her settlement demands; and (3) her fee demand, which the court considered excessive. Richard argues that Daphna waived her claim by failing to include an adequate record; Daphna does not address adverse findings; and the court acted within its discretion in awarding such fees to Daphna because Richard's greater wealth was no reason to require him to pay Daphna's fees, Richard's fees were higher because he marshaled more evidence, Daphna's position over the value of Richard's assets was overstated, and Richard's settlement offers were made outside of mediation.

### A.   *Factual Background*

After the trial court rendered its statement of decision, on July 31, 2013, Richard moved for sanctions in the form of attorney fees, requesting that Daphna pay $5,038,607

in fees and costs to Richard, or that Daphna pay sanctions in the amount of $4,262,225.[13] Richard asserted he had spent over $8 million in fees; of this, $5,038,067 consisted of fees incurred after his settlement offer of February 2012, at which time he offered a settlement package of $27 million to Daphna under which Richard would have waived a large portion of his separate property claims. Furthermore, Richard contended he continued to make settlement offers through trial that discounted the value of his separate property claims in order to avoid costly and protracted litigation. Richard believed that Daphna overvalued the parties' marital estate and believed that Richard was hiding something. On the other hand, Daphna made unreasonable settlement demands, ranging from $75 million in May 2010 to $50 million in February 2012 to $35 million in June 2012 to $25 million during trial in November 2012. The November 2012 demand was close to Richard's original offer in December 2011.

Furthermore, throughout the proceedings, Daphna refused Richard access to the family residence; she accused Richard of anger issues, alienating their children, and omitting information from his disclosures; Daphna refused to sign preseparation tax returns unless Richard paid the taxes; she propounded over 11,000 interrogatories; and she accused Richard and his current wife of theft and fraud.

In response, Daphna asserted that Richard's discussion of settlement offers breached the confidentiality of settlement negotiations; Richard failed to attach a declaration pursuant to *In re Marriage of Keech* (1999) 75 Cal.App.4th 860 that substantiated in detail the basis of his request for fees; she argued that imposition of such fees would constitute a penalty and unreasonable burden on Daphna. Daphna further contended that Richard mischaracterized the settlement negotiations—Richard valued the marital assets at between $72 to $131 million in 2009 to 2012, with up to $68 million in "suspect" debt; at the time of Daphna's first settlement offer in May 2010, Richard had not identified those assets he considered his separate property. She argued that Richard's

---

[13] The copy of Richard's motion in appellant's appendix does not contain a copy of Richard's supporting declarations.

settlement proposal in June 2010 was vague, and offered $10 million, the Rexford residence, and one-half of the community property. In December 2010, Richard became exceedingly hostile and vulgar towards Daphna, and in August 2011, sent an extremely abusive email to Daphna; in February 2012, he sent another abusive email to Daphna's counsel and all counsel. During trial in November 2012, Daphna made an offer and at the time the parties were only $2 million apart; and Daphna maintained that Richard concealed his interest in Rexford Fund V.

The trial court found that (1) Daphna made many assumptions about the marital estate during the litigation that were not borne out by the evidence at trial; (2) at trial, Daphna chose to rely on her assumptions instead of putting on evidence; (3) she failed to provide an alternative valuation for Rexford Funds I through IV and thus there was no alternative value for the court; (4) Daphna's fee request was too broad and unspecific; the tasks performed as listed consisted of significant review of other attorneys' work and inter-office conferences, resulting in Daphna's attorney fees not being focused or result oriented; (5) Daphna would not consider any other result than an award of the family residence. On the other hand, court observed that Richard had far more knowledge of the parties' assets and greater liquid assets. The court found a fee award under section 2030 to Daphna appropriate and awarded her $750,000.

### B. Discussion

Together, sections 271 and 2107 "give the trial court authority to order sanctions and the payment of attorney fees for breach of a party's fiduciary duty of disclosure and for conduct which frustrates the policy of promoting settlement." (*In re Marriage of Feldman* (2007) 153 Cal.App.4th 1470, 1474.) "A sanction order under . . . section 271 is reviewed under the abuse of discretion standard." (*In re Marriage of Burgard* (1999) 72 Cal.App.4th 74, 82) Section 2030 subdivision (a)(1) provides that a trial court may order a private party litigant to pay another party's attorney fees and costs incurred in a marital dissolution proceeding in order to "ensure that each party has access to legal representation . . . ." In making such an award, the trial court should determine that the charged party has an "ability to pay" and should consider "the respective needs and

31

incomes of the parties." (*In re Marriage of Sullivan* (1984) 37 Cal.3d 762, 768.) An award of attorney fees and costs may be in an amount that is "just and reasonable under the relative circumstances of the respective parties." (§ 2032, subd. (a).)

Here, a principal factor in the reduction of Daphna's fee request was the trial court's belief she had taken an unreasonable position in the proceedings, namely, with respect to Richard's separate property, and had refused to settle when confronted with information concerning the parties' separate and community assets. Although we have affirmed the trial court's characterization of Arden Realty as Richard's separate property, we do not consider Daphna's settlement posture necessarily unreasonable such that it warrants a fee sanction. Further, Daphna's attempt to reopen trial based on Richard's undervaluation of the Rexford Funds and failure to disclose the planned IPO was not unreasonable and thus could not form the basis for a fee sanction. On remand, the trial court is directed to reconsider any fee awards in light of these facts, as well as the financial condition of the respective parties.

**DISPOSITION**

The judgment is affirmed with respect to the characterization of the Arden Realty profits as Richard Ziman's separate property. The matter is affirmed with respect to the issue of the Rexford Funds and Richard Ziman's alleged breach of fiduciary duty stemming from Richard's posttrial disclosure of the upcoming initial public offering. The matter is reversed and remanded for findings and rulings regarding the following issues: (1) whether Richard breached a fiduciary duty by misleading Daphna as to the separate property character of any of his separate property investments in entities that became Arden Realty; and (2) if a breach occurred, whether any remedy should be imposed, and if so what remedy. The matter is reversed and remanded for a modification of the judgment with regard to the due-on-death charitable pledges for which there was no specific evidence of consent by Daphna. Finally, the attorney fees award is remanded for a determination of fees in light of our ruling. The parties are to bear their own costs on appeal.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


CHANEY, Acting P. J.


MOOR, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.